**John Julian O'DANIEL and wife Laquitta Gail O'Daniel, Plaintiffs/Appellees,**

**v.**

**Jeanette Marie MESSIER, Defendant/Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 5, 1995.

Application for Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

John R. Bradley, Hendersonville, for plaintiffs/appellees.

Phillip A. George, Gallatin, for defendant/appellant.

## OPINION

KOCH, Judge.

This appeal involves a biological mother's efforts to preserve her parental relationship with her five-year-old daughter. The child's paternal grandparents filed an adoption petition in the Circuit Court for Sumner County after obtaining temporary custody of their granddaughter. The trial court, sitting without a jury, found that the mother had abandoned her daughter and granted the grandparents' adoption petition. We reverse the order of adoption because the grandparents have not proved by clear and convincing evidence that the mother has abandoned her daughter.

### I.

Jeanette Marie Messier was eighteen-years-old when she gave birth to her first child, Amanda Jean, in November 1988. She was single, unemployed, and estranged from Troy O'Daniel, the child's father. Realizing that she would be unable to support herself and Amanda after Mr. O'Daniel refused to support his daughter,[1] Ms. Messier moved in with her mother, Nancy Messier. Ms. Messier and Amanda lived with Nancy Messier until April 1990, except for two intervals when they stayed with Ms. Messier's father in California and then with one of Ms. Messier's male acquaintances.

Ms. Messier began a relationship with Bobby Smith in December 1989. Her mother strongly disapproved of Mr. Smith and eventually demanded that Ms. Messier either end her relationship with Mr. Smith or move out. Ms. Messier refused to stop seeing Mr. Smith and moved in with him in April 1990. Nancy Messier filed a petition in the Sumner County Juvenile Court seeking custody of her granddaughter in June 1990 but later requested the juvenile court to continue the case indefinitely.

Mr. Smith physically abused both Ms. Messier and Amanda. The authorities investigated several abuse reports between May and November 1990 but could not substantiate that abuse had occurred. Mr. Smith was finally charged with assault in November 1990 when Ms. Messier informed the police that he had hurt Amanda. Mr. Smith was convicted and sentenced to ninety days in jail. These developments prompted Nancy Messier to renew her efforts to gain custody of her granddaughter. On December 17, 1990, the juvenile court granted the Department of Human Services's petition for protective custody, and the department placed Amanda in Nancy Messier's custody.

Nancy Messier was raising two teenage sons on her own when she received custody of Amanda. At first Amanda stayed with Nancy Messier's mother who lived nearby. Amanda began living with Nancy Messier and her two sons in September 1991 when her great-grandmother moved back to Illinois. Ms. Messier visited her daughter frequently while Amanda lived with her grandmother and great-grandmother. Amanda even lived with her mother while Mr. Smith was incarcerated.

[1]. Troy O'Daniel eventually legitimated Amanda, and her surname was eventually changed from Messier to O'Daniel. However, Troy O'Daniel has never financially supported his daughter.

Ms. Messier gave birth to Mr. Smith's son, Brian Smith, in March 1991. In April 1991, Ms. Messier filed the first of four petitions seeking to regain custody of Amanda. The juvenile court never acted on the petition, and Amanda remained in the care of her grandmother and great-grandmother. Ms. Messier visited Amanda almost daily and occasionally kept her overnight.

Mr. Smith continued to abuse Ms. Messier after his release from jail. Nancy Messier cut off all communications with her daughter in November 1991 after Ms. Messier ignored her entreaties to leave Mr. Smith. Ms. Messier filed her second custody petition, but again the juvenile court did not act. After intervention by the Department of Human Services, Nancy Messier relented and permitted her daughter to resume visiting Amanda in late February 1992.

Ms. Messier and Mr. Smith moved in with Mr. Smith's mother. Ms. Messier felt obligated to Mr. Smith because she had given birth to his child and could not bring herself to leave the abusive relationship. Her visits with Amanda became less frequent because Mr. Smith discouraged contacts with Amanda and the other members of her family and because Mr. Smith's mother would not drive her to see her daughter. She obtained several part-time jobs but did not earn enough to support herself or her daughter.

Nancy Messier was experiencing serious financial problems in early 1992. After appealing unsuccessfully for help from Amanda's paternal grandparents, John and Gail O'Daniel, she sent the juvenile court a letter on March 21, 1992, requesting that Amanda be returned to Ms. Messier. The letter prompted Ms. Messier to file her third petition seeking custody of her daughter. Instead of reuniting Amanda and her mother, the juvenile court directed the Department of Human Services to evaluate Ms. Messier's parental fitness and to place Amanda in temporary foster care until the evaluation was complete.

Ms. Messier did not wish her daughter to be placed in a foster home. Both she and her mother suggested that Amanda could live temporarily with her paternal grandparents. John and Gail O'Daniel agreed to take Amanda in and also agreed not to interfere with Ms. Messier's relationship with her daughter. On April 27, 1992, the juvenile court awarded Mr. and Mrs. O'Daniel temporary custody of their granddaughter. Despite their earlier promises, Mr. and Mrs. O'Daniel declined to permit telephone calls between Amanda and her mother and permitted visits only at times when Ms. Messier was working. As a result, Ms. Messier did not see Amanda until July 16, 1992, when Mr. and Mrs. O'Daniel permitted a thirty-minute visit.

In the meantime, Ms. Messier reconciled with her mother and completed the parenting classes sponsored by the Department of Human Services. With her mother's support, she ended her relationship with Mr. Smith in July 1992. She also obtained employment, found subsidized housing, and filed her fourth petition to regain custody of Amanda. The juvenile court continued the petition and directed the Department of Human Services to supervise Ms. Messier's visits. Mr. and Mrs. O'Daniel permitted Ms. Messier to visit Amanda approximately eight times between July and November 1992 but required the visits to take place in their home and under their supervision.

On October 23, 1992, Mr. and Mrs. O'Daniel filed an adoption petition in the Circuit Court for Sumner County, alleging that Ms. Messier had abandoned her daughter. Their son consented to the adoption, but Ms. Messier opposed it. Following a trial on June 24, 1993, the trial court found that Ms. Messier had abandoned her daughter by failing to visit her and to support her financially. The trial court also determined that permitting Mr. and Mrs. O'Daniel to adopt Amanda would be in her best interests because of (1) the substantial likelihood that Ms. Messier would expose Amanda to further abuse, (2) the remote possibility that Ms. Messier would be able to regain custody of Amanda in the near future, and (3) the likelihood that continuing Ms. Messier's parental relationship with Amanda would diminish Amanda's chances of early integration into a stable and permanent home. Accordingly, the trial court terminated Ms. Messier's and Troy O'Daniel's parental rights and permitted Mr.

and Mrs. O'Daniel to adopt Amanda. Ms. Messier then perfected this appeal.

## II.

■ Biological parents have a fundamental liberty interest in the care and custody of their children under both the United States and Tennessee Constitutions. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *In re Adoption of Female Child (Bond v. McKenzie)*, 896 S.W.2d 546, 547 (Tenn.1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994); *In re Riggs*, 612 S.W.2d 461, 469 (Tenn.Ct.App.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). These parental rights are superior to the rights of others and continue without interruption unless a biological parent consents to relinquish them, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child. *State ex rel. "A" v. A Licensed or Chartered Child–Placing Agency*, 194 Tenn. 400, 406, 250 S.W.2d 776, 778 (1952); *In re Rigsby*, App. No. 01–A–01–9304–CV–00171, slip op. at 4–5, 19 T.A.M. 9–12, 8 T.F.L.L. 6–8, 1994 WL 35919 (Tenn.Ct.App. Feb. 4, 1994) (No Tenn.R.App.P. 11 application filed).

■ Adoption proceedings profoundly affect not only the rights of the biological parents but also the rights of the child and the adoptive parents. The biological parents whose rights are terminated are reduced to the role of complete strangers as far as the child is concerned. *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re Adoption of Dearing*, 572 S.W.2d 929, 932 (Tenn.Ct.App.1978). At the same time, the adoptive parents acquire all the parental rights and responsibilities "as if the child had been born to them in lawful wedlock." Tenn. Code Ann. § 36–1–126(a) (Supp.1994); *Gri-*

*der v. Grider*, 182 Tenn. 406, 409–10, 187 S.W.2d 613, 614 (1945).

■ The constitutional protection afforded the parent-child relationship demands that adoption proceedings contain safeguards against unwarranted termination or interference with a biological parent's parental rights. These safeguards generally take three forms. The first safeguard is the requirement that parents receive notice of the adoption proceeding. The second safeguard is that the parents' rights cannot be terminated without proof of surrender, abandonment, or other misconduct that substantially harms the child. The third safeguard is the requirement that the abandonment or misconduct be proved by clear and convincing evidence. *In re Rigsby, supra,* slip op. at 5.

Ms. Messier's appeal involves the latter two safeguards. It requires us to decide whether Mr. and Mrs. O'Daniel have proved by clear and convincing evidence that Ms. Messier abandoned her daughter. To decide this issue, we must again consider the type of conduct that will be considered "abandonment" in adoption proceedings and the nature of the evidentiary burden imposed on persons seeking to prove that a biological parent has abandoned his or her child.

## III.

Tennessee lacks uniform standards for determining whether a parent has abandoned his or her child. The courts presently apply one of three different standards depending on the type of proceeding.[2] The existence of three standards causes confusion and inconsistent results. *Foster v. Podlich,* App. No. 03–A–01–9209–CV–00355, slip op. at 11, 18 T.A.M. 16–13, 7 T.F.L.L. 7–3, 1993 WL 87838 (Tenn.Ct.App. Mar. 26, 1993) (No Tenn. R.App.P. 11 application filed).[3]

---

**2.** Tenn.Code Ann. § 37–1–102(b)(1) (Supp.1994) defines "abandoned child" for the purpose of proceedings in juvenile court. Tenn.Code Ann. § 36–1–102(1) (Supp.1994) defines "abandoned child" for the purpose of proceedings in circuit and chancery courts; however, the definition does not apply to adoption proceedings. *In re Adoption of Bowling,* 631 S.W.2d 386, 389 (Tenn. 1982); *In re Adoption of Parsons,* 766 S.W.2d 196, 200 (Tenn.Ct.App.1988); *Koivu v. Irwin,* 721 S.W.2d 803, 807 n. 2 (Tenn.Ct.App.1986); *Ex*

*parte Wolfenden,* 49 Tenn.App. 1, 4, 349 S.W.2d 713, 714 (1959). The third standard applicable to adoption proceedings is judicially created.

**3.** A special legislative committee has been studying Tennessee's adoption laws since 1993. *See* S.J.Res. 17, 98th Gen.Assembly, 1st Sess., 1993 Tenn.Pub. Acts 1050. The committee has introduced legislation in the Ninety–Ninth General Assembly that, if enacted, will replace the three existing abandonment standards with a single

■ The Tennessee Supreme Court has articulated the standards for determining abandonment in adoption cases as follows:

Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. . . .

*In re Adoption of Bowling,* 631 S.W.2d at 389 (*quoting Ex parte Wolfenden,* 49 Tenn.App. at 5, 349 S.W.2d at 714). *See also In re Adoption of Female Child (Bond v. McKenzie),* 896 S.W.2d at 547. This court has held that the evidence of abandonment must show a "conscious disregard or indifference" for parental obligations and must demonstrate that there has been

an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relationship and throw off all obligations growing out of the same.

*Fancher v. Mann,* 58 Tenn.App. 471, 476, 432 S.W.2d 63, 65 (1968). Accordingly, we concluded that the conduct must amount to "an absolute, complete and intentional relinquishment of all parental control and interest . . . [in] the child" in order to constitute abandonment. *Fancher v. Mann,* 58 Tenn.App. at 478, 432 S.W.2d at 66.

■ The courts have consistently used the standards in *Ex Parte Wolfenden* and *Fancher v. Mann* to determine whether a parent has abandoned his or her child.[4] These decisions demonstrate that the courts consider the following matters when determining whether an abandonment has occurred: (1) the parent's ability to support the child; (2) the amount of support the parent has provided to the child; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts on special occasions; (5) whether the parent volun-

tarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to the removal of the child. *See In re Rigsby, supra,* slip op. at 10; *Koivu v. Irwin,* 721 S.W.2d at 807. No single factor is controlling. Abandonment inquiries are heavily fact-oriented, so the courts may consider any fact that assists in deciding whether the parent's conduct demonstrates a conscious or willful disregard of all of his or her parental duties. *In re Rigsby, supra,* slip op. at 10.

### IV.

■ The heightened burden of proof imposed on those seeking a declaration of abandonment in an adoption case is another safeguard against a wrongful termination of a biological parent's parental rights. Unlike most civil cases that require proof by a preponderance of the evidence, adoption cases require the party asserting that a parent has abandoned his or her child to prove their case by clear and convincing evidence. *In re Adoption of Female Child (Bond v. McKenzie),* 896 S.W.2d at 547; *In re Adoption of Self,* 836 S.W.2d at 583; *Koivu v. Irwin,* 721 S.W.2d at 807; *Fancher v. Mann,* 58 Tenn. App. at 477, 432 S.W.2d at 66.

The use of a heightened standard reflects the importance of the public and private interests affected by an adoption as well as the community's judgment concerning the allocation of the risk of error between the litigants. *See Santosky v. Kramer,* 455 U.S. at 755, 102 S.Ct. at 1395; *In re Rigsby, supra,* slip op. at 11. It instructs the fact-finder concerning the degree of confidence the community believes that the fact-finder should have in the correctness of its conclusions. *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979).

---

standard. *See* S. 653/H. 406, 99th Gen.Assembly, 1st Sess., § [1], 36–1–102(1), at 3–6 (1995).

**4.** *In re Adoption of Female Child (Bond v. McKenzie),* 896 S.W.2d at 547; *In re Rigsby, supra,* slip op. at 10; *In re Adoption of Self,* 836 S.W.2d 581, 582–83 (Tenn.Ct.App.1992); *In re Adoption of Parsons,* 766 S.W.2d at 200; *Pierce v. Bechtold,* 60 Tenn.App. 478, 485–86, 448 S.W.2d 425, 428–29 (1969).

The pending legislation to rewrite the adoption laws specifically "overrules" the current judicially created adoption standards. *See* S. 653/H. 406, 99th Gen.Assembly, 1st Sess., § [1], 36–1–102(1)(G), at 6 (1995). The bill cannot affect this proceeding. It remains only a proposal, and even if enacted, it will not become effective until January 1, 1996. *See* S. 653/H. 406, 99th Gen.Assembly, 1st Sess., § [19] (1995).

The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn.Ct.App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S.Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct.App.1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn.Crim.App.1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992). It should produce in the factfinder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn.Ct.App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.Ct.App.1985).

### V.

We now turn to the question of abandonment. The trial court found that Ms. Messier had abandoned Amanda by failing to support her financially and by failing to visit her. Ms. Messier has, however, maintained her relationship with Amanda even though she has been unable to support her. Accordingly, we conclude that her conduct has been motivated not by a conscious disregard or indifference to her parental responsibilities but rather by disadvantaged circumstances and family strife.

### A.

#### Ms. Messier's Support of Amanda

Parents have a responsibility to feed, clothe, and house their children. A parent's failure to support his or her child plays an important role in abandonment de-

terminations, *Koivu v. Irwin*, 721 S.W.2d at 807; *Derryberry v. Martin*, 686 S.W.2d 94, 97 (Tenn.Ct.App.1984), but it is not the sole or determining factor. *Fancher v. Mann*, 58 Tenn.App. at 476, 432 S.W.2d at 65. Of equal importance are the parent's efforts to maintain a relationship with the child, the reason why the child was separated from the parent in the first place, and the duration of the separation. *In re Rigsby, supra,* slip op. at 12.

The increasing number of children born to unmarried, teenage mothers is a sad reality today. Nearly one-third of all the children born in Tennessee are born to unwed mothers and are raised in single-parent households.[5] Teenage girls living in poverty are five and one-half times more likely to become teenage mothers.[6] Accordingly, over twenty-five percent of Tennessee's children are presently living below the federal poverty level, and a high proportion of these children are living in female-headed families. Young unwed mothers find it increasingly difficult to support themselves and their children, and many of them must rely on welfare and other forms of governmental assistance.[7]

Single unwed parents are less likely to be able to support their children than married couples in more financially secure circumstances. They are parents nonetheless, and the continuation of their relationship with their children should not depend solely on their financial means. A parent should not lose a child because others, including other family members, might be better able to support the child. Accordingly, we have held that a parent's failure to support a child will not amount to abandonment when the "parent is financially unable to render financial support." *Pierce v. Bechtold*, 60 Tenn.App. at 487, 448 S.W.2d at 429.

Ms. Messier has not supported her daughter financially. She explained that she has been forced to rely on federal assistance and help from other family members because she could not earn enough money to support her daughter and herself. She testified without

---

5. Tennessee Comm'n on Children & Youth, *Kids Count: The State of the Child in Tennessee* 8–9 (1994).

6. *Id.* at 10.

7. *Id.* at 10.

contradiction that her income from a series of part-time jobs between 1988 and 1992 barely enabled her to make ends meet. The trial court itself recognized Ms. Messier's inability to contribute money for Amanda's support.

The record does not contain clear and convincing evidence that Ms. Messier has been able to support Amanda financially and has willfully refused to provide this support. Accordingly, the trial court should not have based its finding of abandonment on Ms. Messier's failure to support Amanda financially.

### B.

#### Ms. Messier's Visitation With Amanda

The trial court also based its finding of abandonment on Ms. Messier's repeated failure to visit Amanda. The trial court correctly found that there had been lapses in Ms. Messier's visitation with Amanda. We do not concur, however, that these lapses provide clear and convincing evidence of Ms. Messier's conscious disregard or indifference to her parental responsibilities or of her intentional relinquishment of her parental control and interest in Amanda.

Ms. Messier did not relinquish her daughter voluntarily. Even after the juvenile court awarded her mother custody of Amanda, Ms. Messier visited with her daughter almost daily and kept her daughter for longer periods during holidays and while Mr. Smith was incarcerated. Ms. Messier did not visit Amanda for approximately three months between November 1991 and February 1992 because her mother would not permit her to see her child. She also explained that Mr. Smith and his mother discouraged her visits with Amanda. Ms. Messier's visits resumed after she asked the Department of Human Services to intercede with her mother on her behalf. During this time, Ms. Messier filed three petitions with the juvenile court requesting custody of her daughter.

Mr. and Mrs. O'Daniel obtained custody of Amanda in April 1992 after Ms. Messier suggested that they take her in as an alternative to placing her in a foster home. In a laudable effort to provide some order in their granddaughter's life, Mr. and Mrs. O'Daniel established a fairly strict schedule for her eating, napping, and socializing. Because many of the times Mr. and Mrs. O'Daniel set aside for visiting conflicted with Ms. Messier's employment, she was required to forego the visits from April to July 1992. Ms. Messier's visits with Amanda resumed after illness caused her to stop working. Ms. Messier visited her daughter regularly between July and October 1992 when the juvenile court revoked her visitation privileges. Mr. and Mrs. O'Daniel insisted that these visits be supervised, and Ms. Messier stated that Mr. and Mrs. O'Daniel made her uncomfortable during these visits.

Ms. Messier continued to visit her daughter and filed four petitions to regain custody between December 1990 and October 1992. While more frequent visitations during at least two intervals would have been preferable, the overall consistency of visitation demonstrates that Ms. Messier sought to maintain a relationship with her daughter despite the obstacles placed in her way. She has undoubtedly made mistakes and exercised poor judgment at times, but she has not displayed a settled purpose to relinquish all her parental duties and responsibilities.

The record does not contain clear and convincing evidence that Ms. Messier has consciously disregarded her parental relationship with Amanda. Despite several periods of sporadic visitation, she has made genuine efforts to remain in contact with her daughter and has repeatedly attempted to convince the courts to return Amanda to her. Accordingly, the trial court should not have based its finding that Ms. Messier abandoned Amanda on Ms. Messier's somewhat sporadic visitation between December 1990 and October 1992.

### VI.

The issue of a child's best interest does not arise in an adoption case until there has been a finding of parental unfitness. *In re Adoption of Female Child (Bond v. McKenzie)*, 896 S.W.2d at 547; *Nale v. Robertson*, 871 S.W.2d at 680; *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn.1993). Since we have determined that the record does not

contain clear and convincing evidence that Ms. Messier abandoned Amanda, we must set aside the trial court's findings concerning Amanda's best interests. Several observations concerning the trial court's findings are in order, however, because the issue of Amanda's custody is destined to return to the courts as long as tension exists between Ms. Messier, her mother, and Mr. and Mrs. O'Daniel.

Ms. Messier's circumstances have been regrettably typical of those encountered by many teenage unmarried mothers. Her lack of resources and education have undermined her ability to support herself and her child, and her unfortunate abusive relationship with Mr. Smith has undermined her relationship with her family and has eroded her self-esteem. There is no doubt that significant challenges await her as she tries to break out of the cycle of poverty and abuse. Her mother's renewed encouragement and support enhance her chances of success, but no one, especially the courts, can foretell whether she will succeed.

We do not find that Ms. Messier should have custody of her daughter. Amanda has thrived while in the care of Mr. and Mrs. O'Daniel, and the record contains no basis for changing these custody arrangements at this time. The record likewise provides little support for the conclusion that Ms. Messier will expose Amanda to further abuse or that permanently terminating Ms. Messier's parental rights will hasten Amanda's integration into a stable and permanent home. Mr. and Mrs. O'Daniel are presently providing Amanda with a stable home, and the record contains no indication that they will cease caring for their granddaughter if they are not permitted to adopt Amanda.

## VII.

We reverse the finding that Ms. Messier abandoned Amanda and vacate the conclusion that it would be in Amanda's best interests to terminate her mother's parental rights and to permit Mr. and Mrs. O'Daniel to adopt the child. We also remand the case for further proceedings consistent with this opinion and tax the costs of this appeal to John and Laquitta Gail O'Daniel for which execution, if necessary, may issue.

LEWIS, J., and IRVIN H. KILCREASE, Jr., Special Judge, concur.