In re the ADOPTION OF Chase Landon THOMPSON, James Richard Smith and Stacci Thompson Smith, Joint Petitioners–Appellees,

v.

Jeffery Trevor MONTIETH, Respondent–Appellant.

Court of Appeals of Tennessee, Western Section, at Knoxville.

Oct. 14, 1996.

Application for Permission to Appeal Denied by Supreme Court March 3, 1997.

Phillip C. Lawrence, Poole, Lawrence, Thornbury, Stanley & Morgan, Chattanooga, for Petitioners–Appellees.

Leslie B. McWilliams, Chattanooga, for Respondent–Appellant.

CRAWFORD, Presiding Judge, Western Section.

This is an appeal of the trial court's order terminating appellant's parental rights.

The appellant, Jeffery Trevor Montieth (Father), is the natural father of the minor child, Chase Thompson. Appellee, Stacci Thompson Smith (Mother), is the mother of the child, and appellee James Richard Smith is Mother's current husband.

At the time the child was conceived, May 26, 1992, Mother was separated from her first husband, Dusty Johnson. In July or August of 1992, Mother resumed living with Johnson. In August of 1992, Mother told

Father that she was pregnant, and that he may be the father of the child because she had not been involved with anyone but him at the time of conception. Mother contends that at this time she asked Father "if he wanted to have anything to do with the child," and he responded, "[h]e didn't want to get into it." In October of 1992, Mother and Johnson separated again.

Father and Mother apparently did not see each other again until December of 1992, when the two ate dinner together at Mother's parents' house. At this time the parties had no discussion regarding Father having a relationship with the child.

The child was born February 13, 1993. On February 15, 1993, Mother called Father to report the birth of the child, and she "left it sort of open for him" to come and visit the child if he so desired. Following the February 15th phone call, Mother and Father had no contact or communication until August of 1993. In August of 1993, Mother telephoned Father to tell him that she intended to inform Johnson that he (Johnson) was not the father of the minor child. Also in August of 1993, Mother visited with Father at his place of employment to talk with him and to give him a picture of the child. At that time, the child was in the car with one of Mother's friends, but Father did not request to see the child or exhibit any interest in the child at all.

Mother became involved with appellee, James Smith, in September of 1993. Father contends that during Mother's involvement with Smith, he (Father) requested visitation with the child, but Mother refused to allow Father to see the child as long as Father was involved with his then girlfriend.

On September 27, 1993, Mother and her first husband, Johnson, were divorced. In October of 1993 Mother told Father that she was having blood tests performed to determine whether Father or Johnson was the father of the child. Father testified that he wanted to "decide some type of visitation," but he did not want to "get involved in their [Mother and Johnson's] divorce hearings." On October 8, 1993, the results of blood tests taken of Johnson established that he was not the father of the child. Mother called Father

after obtaining the results, and she testified that at that time, Father made no comment regarding his intentions with respect to the child. Father concedes that as of October, 1993, he had no doubt that he was the father of Chase. Mother had no further contact with Father until he called her early in the morning on December 24, 1993. He called her again later on December 24th to request a visit with Chase on Christmas Day, but he failed to call her on Christmas Day to make visitation plans.

In January of 1994, Mother called Father and requested that he visit with Chase. Shortly thereafter, Father visited with Mother and Chase for approximately an hour and a half. At this time, Mother was pregnant with her second child, by appellee James Smith. Mother and Father had no further contact until September of 1994. Mother and appellee James Smith were married August 19, 1994. In September of 1994, Mother contacted Father and informed him that they "need to get things straight with [Chase]." Father called Mother back the next day and told her that he did not "want to give up any rights to Chase."

On December 20, 1994, Father filed a Petition for Legitimation and a Petition to Set Child Visitation in the Juvenile Court of Hamilton County. Following Father's filing of the petition, Mother refused to allow him any visitation with the child. On February 2, 1995, the appellees, Mother and James Smith, the child's step-father, filed a Joint Petition for Adoption which sought to terminate the parental rights of Father.

On February 9, 1995, Father, through his attorney, requested visitation with the child and offered to pay child support. Mother responded by her attorney and refused to allow Father to visit the child and refused the offer of child support.

Father's legitimation petition was transferred to circuit court and consolidated with the adoption petition. On July 17, 1995, the trial court held a hearing on Father's legitimation petition, and on September 6, 1995, entered an order legitimating the child. The court reserved a ruling on visitation and child support pending a hearing on the bifurcated

issue of whether Father had abandoned the child. After an evidentiary hearing, the court found that Father had abandoned the child and by order entered October 18, 1995, terminated Father's parental rights. Father has appealed, and the only issue for review is whether Father abandoned the minor child.

■ In an adoption case in which abandonment of the child is at issue, this Court has stated that:

> Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired ... but when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.

*Ex parte Wolfenden,* 48 Tenn.App. 433, 441, 348 S.W.2d 751, 755 (1961) (citations omitted). This Court has stated that the conduct must amount to an " 'absolute, complete and intentional relinquishment of all parental control and interest ... [in] the child' in order to constitute abandonment." *O'Daniel v. Messier,* 905 S.W.2d 182, 187 (Tenn.App. 1995) (quoting *Fancher v. Mann,* 58 Tenn. App. 471, 478, 432 S.W.2d 63, 66 (1968)). The evidence of abandonment must show "an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relationship and throw off all obligations growing out of the same." *O'Daniel,* 905 S.W.2d at 187 (Tenn.App.1995) (quoting *Fancher v. Mann,* 58 Tenn.App. 471, 476, 432 S.W.2d 63, 65 (1968)). Abandonment must be proven by clear and convincing evidence. *O'Daniel,* 905 S.W.2d at 187. When considering whether an abandonment exists, courts do not look at protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. *Koivu v. Irwin,* 721 S.W.2d 803, 807 (Tenn.App.1986). Abandonment by natural parents may be found only when, being given benefit of every controverted fact, such inference follows from the

evidence as a matter of law. *Ex parte Wolfenden,* 48 Tenn.App. at 444, 348 S.W.2d at 756.

In *In re Adoption of Self,* 836 S.W.2d 581 (Tenn.App.1992), this Court considered the question of whether the biological father of a minor child had abandoned his child. The trial court found that the father had abandoned the child based upon, *inter alia,* the father's failure to exercise visitation with the child for a number of years. *Id.* at 582. This Court reversed the finding of abandonment, based upon, *inter alia,* evidence in the record that the mother of the child refused to allow the father to exercise visitation rights with the child.[1] *Id.* at 584. This Court noted that there was a sharp conflict in the testimony at trial as to whether the father's failure to exercise his visitation rights was based upon an intentional failure to exercise those rights or whether the failure to exercise the visitation rights was based upon the mother's refusal to allow the father to exercise those rights. This Court held that in view of the conflicting testimony regarding father's failure to visit with the child, the evidence of abandonment was not clear and convincing, and noted that while the father had "not been a good parent in many respects," the record in the case did not support a finding of abandonment as defined by the courts in this state. *Id.*

■ The case *sub judice* is analogous to *In re Adoption of Self,* 836 S.W.2d 581. The record before us indicates that from the time Chase was born, February of 1993, until January of 1994, Father exhibited little interest in having a parental relationship with Chase. Father testified that in January of 1994, he requested that Mother allow him to visit with Chase. Father testified that Mother refused to allow him visitation with Chase as long as he (Father) was involved with his girlfriend. At trial, Father testified as follows:

> Q. When you went to her mother's house in January of 1994, was Chase there?
>
> A. Yes.
>
> Q. Did you visit with Chase at that time?
>
> A. Yes.

---

1. The mother of the child refused to allow the father to exercise his visitation rights, because

the father was in arrears in his child support payments.

Q. Were you and Ms. Thompson able to work out anything about your seeing Chase?

A. No, the only thing Ms. Thompson said was as long as I'm involved with Ms. Medley that I wouldn't have any chance of seeing Chase and she said it was best that I just do my own thing and her and Ricky raise Chase and their current son that they have. She informed me that she was pregnant with—you know, she informed me that she was pregnant with Mr. Smith's baby and as far as Chase went there was no way of me seeing Chase as long as I was involved with Ms. Medley.

Contrary to Father's testimony, Mother stated that Father had visited with her and Chase in January of 1994, but she testified that Father expressed no interest in having a parental relationship with Chase at that time.

Father also testified that Mother again refused to allow him visitation once he filed the legitimation petition, and Mother admitted that she did refuse to allow Father visitation with Chase after he filed the legitimation petition. She testified as follows:

Q. So you were aware of the fact that he filed a petition for legitimation?

A. Yes.

Q. And from that point in time did you let him visit with the child?

A. No.

Q. And, in fact do you recall in February of 1995 through your attorney refusing to allow visitation, formally refusing to allow visitation and refusing support?

A. Yes.

Q. And you have not let him visit with this child since he filed this petition for legitimation?

A. In 1995, yes.

Q. You've not allowed him to visit since November of 19—at least since November of 1994; is that correct?

A. It was December.

■ Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). Based upon the record before us, and the conflicting testimony therein, we think the appellees have failed to clearly and convincingly prove that Father abandoned Chase. While Father has to date not taken an active parental role in Chase's life, the testimony in the record indicates that he has attempted to establish a parental relationship with Chase by requesting visitation with Chase, but that he has been thwarted in those attempts by Mother. Father testified that he requested and was refused visitation with Chase in January of 1994. Mother, on the other hand, testified that Father expressed no interest in having a parental relationship with Chase in January of 1994. Since this is an abandonment case in which Father's parental rights are at issue, Father must be given the benefit of this controverted fact. *Ex parte Wolfenden,* 48 Tenn.App. at 444, 348 S.W.2d at 756 ("Abandonment by natural parents may be found only when, being given benefit of every controverted fact, such inference follows from the evidence as a matter of law." (citations omitted)). In any event, it is undisputed that once Father filed his Petition for Legitimation and Petition to Set Child Visitation, Mother refused to allow him visitation with Chase.

In light of Father's attempts to obtain visitation with Chase by conveying his requests for such visitation to Mother and by filing for visitation in both the juvenile and circuit courts in the proceedings below, we think there is certainly a lack of clear and convincing evidence that Father has "evince[d] a settled purpose to forego all parental duties and relinquish all parental claims to the child." *See Ex parte Wolfenden,* 48 Tenn.App. at 441; 348 S.W.2d at 755. By so holding, we do not imply that Father is without fault or that he has demonstrated conduct associated with responsible parenthood. The record indicates that Father has foregone several opportunities to visit with Chase. The record also indicates that Father had no doubt that he was the father of Chase in October of 1993, and that Father did not exercise any visitation with Chase until January of 1994. The record further establishes that Father did not begin to take

legal action to assert his parental rights with respect to Chase until September of 1994, when he contacted a lawyer referral service. However, we do not believe that Father's dereliction in these instances constitutes an "absolute, complete and intentional relinquishment of all parental control and interest" in Chase. *See O'Daniel,* 905 S.W.2d at 187. In summary, the appellees have simply not shown by clear and convincing evidence that Father has abandoned Chase.

Accordingly, the judgment of the trial court terminating the parental rights of Father is reversed. The case is remanded to the trial court for further proceedings to determine the amount of Father's child support payments and to establish his reasonable visitation rights. Costs of the appeal are assessed against the appellees.

FARMER, J., and WILLIAM H. INMAN, Senior Judge, concur.