# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**June 12, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

IN THE MATTER OF:                )
T.J.H., (DOB 7/29/95)            )  Humphreys Chancery
and                              )  No. 24-007
M.S.M., (DOB 5/29/91)            )
                                 )  Appeal No.
(Children under the age of 18)   )  01A01-9712-CH-00736
                                 )
                                 )
                                 )

APPEAL FROM THE CHANCERY COURT
FOR HUMPHREYS COUNTY
AT WAVERLY, TENNESSEE

THE HONORABLE LEONARD W. MARTIN, CHANCELLOR

Guardian ad litem:                          For the Respondents/Appellants:

Clifford K. McGown, Jr.                     Janet S. Kelley
Waverly, Tennessee                          Waverly, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the termination of the parental rights of two persons who have a history of serious mental illnesses. The two children at issue in this case were temporarily removed from their parents' custody in mid-1996 following the hospitalization of the younger child for poisoning. In April 1997, the children's guardian ad litem filed a petition in the Chancery Court for Humphreys County seeking to terminate parental rights. Following a bench trial, the trial court entered an order terminating parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 1997). On this appeal, the parents assert that the trial court's decision is not supported by clear and convincing evidence. We have carefully evaluated the record and have determined that it contains clear and convincing evidence to support the termination of these parents' parental rights.

## I.

R.M.H. is a 43-year-old former resident of New York. She was married for a time while living in New York and had three children,[1] the youngest of whom, M.S.M., was born on May 29, 1991. She is of borderline intelligence and has been diagnosed with a bi-polar disorder with major clinical depression. While still in New York, R.M.H. began a relationship with W.H. who is now 37 years old. W.H. has a long history of psychiatric disorders, suicide attempts, and drug abuse. He has been divorced[2] and has also been hospitalized in psychiatric hospitals in both New York and Florida. He is of low-average intelligence and has been diagnosed as a paranoid schizophrenic.

R.M.H. and W.H. arrived in Davidson County in October 1994. They first came to the attention of the Department of Human Services in November 1994 following a complaint that W.H. had physically abused M.S.M. On December 19, 1994, the Department took custody of M.S.M. after both R.M.H. and W.H. were arrested for possession of illegal drugs. After the Department discovered that R.M.H.

---

[1]R.M.H.'s two oldest children were placed in foster care in New York.

[2]W.H. had a child in New York who was placed in foster care.

and W.H. were living in a van and had no apparent means of support, it filed a petition in the Davidson County Juvenile Court for temporary custody of M.S.M.

In the months that followed, R.M.H. was released from jail and was able to find suitable housing. In April 1995, a juvenile court referee entered an agreed order finding that M.S.M. should remain in the legal custody of the Department but that R.M.H. could have physical custody. The Department agreed to provide R.M.H. and W.H. with in-home intervention services, day care, and mental health services, and R.M.H. agreed not to leave Davidson County.

Notwithstanding her agreement not to leave Davidson County, R.M.H. and W.H. moved to Humphreys County, and R.M.H. discovered that she was pregnant with W.H.'s child. T.J.H. was born on July 29, 1995. The Department's employees in Humphreys County began providing services to the parents in August 1995, and on August 31, 1995, the Davidson County Juvenile Court returned the legal custody of M.S.M. to R.M.H. with the understanding that the Department would continue to monitor the case.

On May 17, 1996, T.J.H. was admitted to the pediatric intensive care unit at Vanderbilt University Medical Center because she had been poisoned. R.M.H. and W.H. denied culpability, and R.M.H. asserted that either her 14-year-old stepson or M.S.M. was responsible. On May 24, 1996, the Tennessee Department of Children's Services filed a petition in the Humphreys County Juvenile Court seeking temporary custody of T.J.H. because she had been poisoned and because she was developmentally delayed. T.J.H. was released from the hospital into the custody of the Department.

On June 21, 1996, the Department filed a second petition in the Humphreys County Juvenile Court seeking temporary custody of M.S.M. The Department alleged that the boy was dependent and neglected because (1) his sister had been poisoned, (2) Vanderbilt physicians had determined that R.M.H. was not competent to care for her child, (3) R.M.H. had told caseworkers that she feared that W.H. might physically harm M.S.M., and (4) both R.M.H. and W.H. were not taking their psychotropic medication. On June 27, 1996, the juvenile court awarded legal custody of M.S.M. to the Department but permitted R.M.H. and W.H. to retain physical

custody; however, on August 22, 1996, the trial court gave physical custody of M.S.M. to the Department. M.S.M. joined T.J.H. in the same foster home. During their visits with their children, both R.M.H. and W.H. continued to act aggressively and disruptively toward the caseworkers working with the family.

On April 11, 1997, the children's guardian ad litem filed a petition to terminate R.M.H.'s and W.H.'s parental rights pursuant to Tenn. Code Ann. §36-1-113(g)(3)(A). The guardian ad litem asserted that each parent's mental condition was likely to remain so impaired that it was unlikely that the parents would be able to assume or resume the care of and responsibility for the minor children in the near future. Following a hearing on April 11, 1997, the trial court filed a memorandum opinion and order on September 4, 1997, terminating R.M.H.'s and W.H.'s parental rights with regard to M.S.M. and T.J.H. based on the persistence-of-conditions ground in Tenn. Code Ann. § 36-1-113(g)(3)(A).

## II.

Proceedings involving the termination of parental rights implicate the biological parents' constitutionally protected interests in their children. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). Because terminating parental rights has the legal effect of reducing biological parents to the role of complete strangers as far as the children are concerned, *see In re Adoption of Dearing (Adcock v. Saliba)*, 572 S.W.2d 929, 932 (Tenn. Ct. App. 1978), decisions to terminate parental rights are permissible only when continuing the parent-child relationship poses a substantial threat of harm to the children. *See Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 581 (Tenn. 1993).

Due to the fundamental interests at stake in proceedings of this sort, parental rights may be terminated only if one or more of the statutorily defined circumstances requiring termination have been proved by clear and convincing evidence, *see* Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 1997); *Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996), and if terminating parental rights is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1997). This heightened burden of proof reflects a recognition of the significant public and private

interests at stake in these proceedings and a policy decision that a biological parent's legal relationship with his or her child should not be severed if there exists any serious or substantial doubt concerning the correctness of the decision. *See O'Daniel v. Messier*, 905 S.W.2d at 187-88.

The statutory ground on which the termination in this case is based is found in Tenn. Code Ann. § 36-1-113(g)(3)(A). This section provides that parental rights may be terminated upon the introduction of clear and convincing evidence (1) that the child has been removed from the parent's home by order of a court for six months, (2) that the conditions which led to the child's removal, or other similar conditions, still persist, (3) that there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent in the near future, and (4) that the continuation of the parent-child relationship will greatly decrease the child's chances of early integration into a stable and permanent home.

## III.

By far, the two most serious persistent conditions in this case are R.M.H.'s and W.H.'s mental illnesses and their inability to manage their prescribed psychotropic medications. These medications are the primary treatment for the parents' illnesses, and the dosage regimen must be followed strictly if the medication is to be effective. A physician who evaluated R.M.H. and W.H. reported that both parents stated unequivocally that they were unwilling to take their medication regularly. The parents' statements are reinforced by their efforts to disrupt the Department's efforts to monitor whether they were taking their medications.

Both R.M.H. and W.H. have continued to behave aggressively during visitation, sometimes even threatening the caseworkers. Accordingly, we find persuasive the consulting psychologist's conclusion that any child in R.M.H.'s care would be at risk for physical or psychological harm because she must use all her psychic energy to care for herself and, therefore, cannot discern or meet a child's needs. Of equal import is the psychologist's conclusion that W.H. is clearly delusional, hostile, angry, and without self-control. He has attempted suicide twice, is at a high risk for substance abuse, and has not learned how to manage his anger. He is clearly incapable of dealing with the regular challenges of raising a child.

A physician who regularly treats R.M.H. and W.H. testified concerning R.M.H.'s use of marijuana and W.H.'s use of cocaine. She observed that R.M.H. could have a good prognosis if medicated properly but noted that R.M.H. did not take her medications regularly. The physician also testified that W.H.'s prognosis was poor because his disease invariably causes steady deterioration. She also testified that high stress situations could cause either parent to have a nervous breakdown and that persons with these types of psychological disorders would have a difficult, although not impossible, time parenting children.

We conclude that the record contains clear and convincing evidence that neither R.M.H. nor W.H. have remedied their inability to manage their psychological disorders. Two physicians testified that a history of past non-compliance with medication portends a diminished chance of success in the future. The expert testimony supports the conclusion that R.M.H. and W.H. are unable to provide a stable home for their children and that continuing the parental relationship could expose the children to a substantial threat of harm.

## IV.

Both M.S.M. and T.J.H. were failing to thrive and were developmentally delayed when they were removed from their parents' custody in June 1996. T.J.H. had essentially fallen off the growth chart, and M.S.M. was very small for his age. T.J.H. could not walk or talk, was still on a bottle, and showed little interest in her surroundings. M.S.M. was agitated and anxious, suffered from sleep disorders, and wanted very little interaction with the world. He had also been preliminarily diagnosed with Attention Deficit-Hyperactivity Disorder, although another consulting psychiatrist believed that his symptoms were more consistent with Post Traumatic Stress Syndrome stemming from his anxiety about his parents.

Both children's circumstances have improved dramatically since being placed in a foster home. T.J.H. is now eating on her own and has gained weight. She is walking and talking, and her caseworker describes her as a happy child. M.S.M. has also gained weight and has more color in his face. He interacts well with others, is more affectionate, and is better able to control his behavior. He has learned his "A,B,C's," and has also learned how to count. The evidence showing that both children have thrived since being placed in foster care provides clear and convincing

evidence that terminating R.M.H.'s and W.H.'s parental rights will hasten M.S.M.'s and T.J.H.'s early integration into a stable, permanent home.

**V.**

We affirm the termination of R.M.H.'s and W.H.'s parental rights with regard to M.S.M. and T.J.H. and remand the case for whatever further proceedings may be required. We also tax the costs of this appeal to the Department of Children's Services.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

_____
WILLIAM B. CAIN, JUDGE