IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 12, 2001, Session

## IN RE:  SIERRA CHEYENNE SATTERWHITE

### Appeal from the Chancery Court for Hamilton County
### No. 99 A 023      W. Frank Brown, III, Chancellor

## FILED APRIL 17,  2001

## No. E2000-02107-COA-R3-CV

---

The Maternal Grandparents of the Minor Child filed a petition to terminate the biological father's and Mother's parental rights to Minor Child and to adopt her.  The Minor Child, who was born out of wedlock, had lived with her Maternal Grandparents all of her life.  She viewed her grandparents as her parents.  Default judgment was granted against Mother.  Father never supported the child and had limited visitation with her.  The Trial Court terminated both the biological Father's and Mother's parental right's.  Father appealed.  We affirm the decision of the Trial Court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Alan R. Beard, Chattanooga, Tennessee, for the Appellant, Timothy Pelfrey

Glenna M. Ramer, Chattanooga, Tennessee, for the Appellees, James and Margaret Satterwhite

### OPINION

This is a termination of parental rights case filed by the Maternal Grandparents of Minor Child, who seek to adopt the child.  Default judgment was entered against Mother.  The Trial Court ordered parental rights of the Father to be terminated and this appeal ensued.

### I.  FACTS

Mother was still living at home when she became pregnant with Father's child in late 1993.[1] Maternal Grandmother forbade Mother from having any further contact with Father. Minor Child was born out of wedlock on February 16, 1994. She always lived with her Maternal Grandparents. Maternal Grandmother was Minor Child's full time care giver. Mother has limited mental acuity, other psychological problems, an explosive temper and handled the Minor Child roughly. Maternal Grandmother would only let Mother leave the home with Minor Child, if Mother was with trusted relatives or friends.

The relationship between the Father and Paternal Grandparents and the Maternal Grandparents has been very acrimonious. Shortly after the child was born, Paternal Grandmother came to visit Minor Child and brought gifts. Maternal Grandmother told the Paternal Grandmother to leave.

Father paid no support, tendered no support, put no support into a savings account or otherwise, and took no court action to establish child support. He did not pay any of Mother's medical expenses or the birth expenses of Minor Child. Father and Paternal Grandparents testified that they had offered support to Mother, but she refused to accept it, as she was still living at home with her parents.

Father's giving presents to Minor Child on her birthday and at Christmas has been very sporadic. Father neither legitimated child nor filed any action to establish paternity of Minor Child.

After Father was released from jail, Mother and Father decided to marry in October 1996. The Minor Child was approximately two and one-half years old then. Represented by legal counsel, Father and Mother attempted to obtain custody of Minor Child by filing a petition in Circuit Court. Circuit Court issued a temporary restraining order granting them exclusive possession of the child.

Aware of the custody order, but not yet served, Maternal Grandmother petitioned for custody of the child in juvenile court. All parties, including Father, Mother, Paternal Grandparents and Maternal Grandparents were represented by legal counsel in the lengthy proceedings. Juvenile court determined that Minor Child was dependent and neglected and awarded Maternal Grandparents legal care and custody of Minor Child. Juvenile court ordered that Father would have two hours per week of supervised visitation with the child at McDonald's restaurant and playground. Juvenile court did not order Father to pay any child support.

Father and Mother had a second child and thereafter divorced. Father was awarded custody of the second child. Mother was given eight hours per week of supervised visitation with second child. Mother is paying child support to Father for child.

_____

[1]During this period of time and for the next several years, Father had continuing criminal problems. In 1994, Father was charged and pled guilty to an attempted rape of a 12 year old girl. He served nine months of a 11 months, 29 days sentence. He was placed on probation for eight years. He had additional criminal charges continuing through 1998.

Father married and divorced a second time. His Second Wife has custody of their child. While Father claims that he has no records of any child support payments for this child, he gives money to Second Wife when he sees her.

Testimony presented at trial indicated Father has a fourth child, also born out of wedlock.[2] Father pays no support for that child.

There was little contact between Minor Child and Father. From the birth of Minor Child on February 16, 1994, to the marriage of the parents on October 15, 1996, there was minimal contact between Father and Minor Child. During the pendency of the juvenile court proceedings, Father was granted minimal visitation in the home of the Paternal Grandparents.[3] Since the juvenile court proceedings, there has been some contact between Father and Minor Child, primarily on Saturday night at McDonald's. Over 50% of the visits at McDonald's were missed by Father. The quality of the visits was not good, especially after Mother was no longer part of the visitation process. When the trial judge talked with Minor Child in chambers, Minor Child indicated that she did not like seeing Father at McDonald's. She said that Father only played with her at McDonald's one time and that her Mother, Father's second wife, and her sister, Ashley, and her cousin, Tamara, played with her some at McDonald's. Minor Child said that Father just sits there and eats and drinks at McDonald's.

The frequency of gifts by Father to Minor Child was sporadic. The Minor Child was given no gifts by Father at Christmas or on her birthday immediately before the filing of the petition to adopt on March 30, 1999.

When Father was deposed he did not know the date of Minor Child's birthday.

## II. ACTION OF THE TRIAL COURT

The Trial Court entered a default judgment against Mother and thereafter held that the evidence established by clear and convincing evidence that both Father's and Mother's parental rights should be terminated.

The Court further found that clear and convincing evidence established that it was in the best interests of Minor Child to terminate the parental rights of Father and Mother. Minor Child viewed her Maternal Grandparents as her psychological parents and they were the only parents she really ever knew on a full-time basis. The Court found that removing Minor Child from the custody of Maternal Grandparents and placing her with Father would pose a substantial risk of harm to her. Minor Child does not relate well to Father and seems to have some fear or at least distrust of him.

---

[2] The child's mother testified that two children were born (twins), but one died shortly after birth.

[3] Minor Child told the Chancellor that when she was visiting with Mother and Father at the trailer, Father placed her in a closet in the dark and she heard Father beat Mother. Mother had bruises on her and Minor Child was scared. Father also spanked her.

Father took a timely appeal to this Court.

## III.  ISSUES

We restate Father's issues to be whether Father willfully abandoned the child, within the meaning of T.C.A. 36-1-113 and current law, and whether the Trial Court utilized the correct legal standard for abandonment.

## IV.  LAW AND DISCUSSION

Our standard of review is as follows:  "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Rule 13(d), Tennessee Rules of Appellate Procedure.  In a *de novo* review, the parties are entitled to a reexamination of the whole matter of law and fact and this court should render the judgment warranted by the law and evidence.  ***Thornburg v. Chase,*** 606 S.W.2d 672 (Tenn. Ct. App.1980); ***American Buildings Co. v. White***, 640 S.W.2d 569 (Tenn. Ct. App.1982); Rule 36 of the Tennessee Rules of Appellate Procedure.  No such presumption, however, attaches to conclusions of law.  ***Adams v. Dean Roofing Co.***, 715  S.W.2d 341 (Tenn. Ct. App.1986).

The essence of Father's argument excusing him from paying child support and paying for Mother's medical expenses associated with the birth of Minor Child is:

> 1.     Maternal Grandmother did not ask for child support for the Minor Child;
> 2.     Maternal Grandmother told  Father she did not want any child support.

He excuses his failure to visit and interact with Minor Child because Maternal Grandmother told Minor Child that she could not sit on his lap or hug him or her Paternal Grandparents.

Father relies heavily  upon  ***In Re: Swanson***, 2 S.W.3d 180 (Tenn. 1999), to support his position.  In ***Swanson***, the Supreme Court held that the definitions in the statute of "willfully failed to support," and "willfully failed to make reasonable payments toward such child support" would be unconstitutional because they "in effect create an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment irrespective of whether that failure was intentional."  The Supreme Court further held that the definition of abandonment under the prior law should be applied until the legislature made some other provision.

Under the law prior to ***Swanson***, an abandoned child was defined as:

> Abandonment, as it pertains to an adoption proceeding, is defined in this state as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.  Evidence of an abandonment must be clear and convincing.  The evidence must clearly show a

conscious disregard or indifference to the parental obligations for a court to forfeit the parental rights and obligations. To determine an abandonment the court is not to look at the protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. [Footnote and citations omitted.]

*Koivu v. Irwin*, 721 S.W.2d 803 at 807 (Tenn. Ct. App. 1986).

Before the passage of Tennessee's amended adoption statute, "abandonment" was based upon seven factors.

> To determine whether the parent's conduct had evinced "a settled purpose to forego all parental duties and to relinquish all parental claims to the child," the courts developed several factors: (1) the parent's ability to support the child; (2) the amount of support provided; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to removal. *See O'Daniel v. Messier*, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995).

*Swanson*, at 184.

*Swanson* can be distinguished from this case in as much as the father in *Swanson* had no knowledge of the whereabouts of child and mother and no way to proffer support on behalf of the Minor Child. Once father learned of the child's whereabouts he actively appealed the court's decision that he willfully abandoned his child.

Abandonment inquires are heavily fact oriented and the courts may consider any fact that assists them in deciding whether the parent's conduct demonstrates a conscious or willful disregard of all of his parental duties. *See O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995). Moreover, it is a well-established principle that the Chancellor is in the best position to assess the credibility of the witnesses. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact. Therefore, such determinations are entitled to great weight on appeal. *See Massengale v. Massengale*, 915 S.W.2d 818 (Tenn. Ct. App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563 (Tenn. Ct. App. 1991); *Weaver v. Nelms*, 750 S.W.2d 158 (Tenn. Ct. App. 1987); *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982). The Chancellor in this matter determined the credibility issues in favor of Maternal Grandparents and their witnesses.

Furthermore, the Chancellor correctly used the seven factors set out in *O'Daniel v. Messier*, to determine if Minor Child had been "abandoned." We shall reiterate each of these factors as the Trial Court did.

The first two factors are the parent's ability to support the child in the four month period immediately before the petition to terminate parental rights was filed. The four month period began

in November 1998 and ended in March 1999. Father's 1999 W-2 revealed an income of $6,530; he earned somewhat less than $550 per month during the year 1999. Father testified that he made "a bunch of money" that was evidence by 1099s, however, the 1099s were not introduced into evidence. Father's 1998 W-2 revealed an income of $14,704.00; he earned approximately $1,225 per month. Testimony was in the record that Father was drawing unemployment compensation. Additionally, at his deposition Father testified:

Q. Right. So how many weeks do you think you worked during 1998?
A. I don't know. I just. . .I worked what I could. I mean, when I didn't have other things that I had to do or something like that.

Father did have the ability to work and to pay some child support. However, the proof showed that no support was provided by Father for the benefit of the Minor Child during the four month time period immediately proceeding the filing of the petition [as well as for any time period]. The Chancellor correctly found that Father paid no support, tendered no support, put no support into a savings account or otherwise. Father neither took court action to establish child support nor did he pay any of the Mother's medical expenses associated with the birth of the Minor Child.

The third factor is the extent and nature of the contact between the parent and the child. The evidence revealed that Father had only token visitation with the Minor Child.[4] While Father may have been physically present during the two hour supervised visitation that was ordered by the juvenile court on Saturday nights from 6 p.m. to 8 p.m. at McDonald's, Father was not interacting with Minor Child. Maternal Grandfather, who supervised the visits, testified that Father would get himself "something to eat and just sit around there and pay no more attention [as][5] if [Minor Child] wasn't even there." Maternal Grandfather would purchase the food for the Minor Child and would help the Minor Child eat. Father did not even purchase the Minor Child's meal at the visits to which he came.

Q    When he first got there would he try to hug [Minor Child]?
A    No, ma'am.
Q    Did he bend over to pat her on the head, the shoulder, any attempt to establish a physical contact with her?
A    No, ma'am. It was just like Sierra wasn't even there. He more or less just sat there and looked around and stared out the – watched the traffic going up and down the road and everything.
. . .
Q    And then what would happen?
A    Well, sometimes he'd leave early. Sometimes he'd stay the whole time.

_____

[4] Token visitation is visitation, that under the circumstances, constitutes nothing more than perfunctory visitation or is of such a nature as to merely establish minimal or insubstantial contact with the child. T.C.A. 36-1-102(1)(C).

[5] We assume the witness intended to say the word "as" or did say it and the court reporter failed to transcribe it.

Q Okay.  After he finished eating did he attempt to interact with [Minor Child]?
A No, ma'am.
Q Okay. What would he do?
A Like I said, he'd just sit there just like nothing.  He wouldn't make no emotion toward her or tell her bye or anything else.  I'd tell him we're fixing to leave, you know, and there ain't nothing never said.
. . .
Q Okay.  Did he talk to her during the visitation?
A No, Ma'am.
Q Of the total, I guess, since the beginning of 1998 there would have been more than 100 visitations.  Of those 100 visitations. . .how many times would [Father] show up?
A I'd say about half of them.

Father testified that while he was married to Mother,  he and Mother interacted with child and they would play in the tunnels.  Then "everything went downhill.  She couldn't talk to us.  She couldn't play with me.  She couldn't do anything.  So the only thing I can do is watch all the kids play with each other. . . .But as long as this has been going on she should have came around and not went further away from  me...."  It is quite apparent from the testimony in this case, that any visitation between Minor Child and Father was sporadic and purely token visitation.  Father was basically just present at McDonald's.  He did not bring games or toys to interact with Minor Child.  He left it up to Minor Child to "come around".

As to the fourth criteria, the frequency of gifts has been occasional.  Some times gifts were given on birthdays and Christmas, and other times were not.  The petition in this case was filed on March 30, 1999.  Father gave no gifts to Minor Child in the four month period before the petition was filed, even though Christmas and the Minor Child's birthday occurred during that time period.  He did give Minor Child gifts at Christmas and on her birthday subsequent to the petition being filed.

The fifth consideration is whether the parent voluntarily relinquished custody of the child.  In this instance,  Father never had custody of child.  He never attempted to legitimate Minor Child.

The sixth consideration is the length of time the child has been separated from the parent.  Minor Child has been separated from the Father all her life - six and one-half years.

The seventh and last consideration is the home environment and conduct of the parent prior to removal.  From the time the Minor Child was born until the petition to adopt was filed Father had continuing criminal problems.  Testimony was presented that during this period Father sired three and possibly five children.  He had custody of one child.  He did not pay support for any of the others.  Father drank and did drugs.  While at the time of trial, Father was exhibiting more

responsible behaviors, that does not excuse what was done up to the time the petition was filed.  *See* T.C.A. 36-1-102 (1)(F).[6]

Moreover, T.C.A. 36-1-102 (1)(G)[7] says specifically it shall not be required that a parent be shown to have evidence a settled purpose to forgo all parental rights and responsibilities in order for a determination of abandonment to be made.

The Chancellor determined by clear and convincing evidence that Father had abandoned Minor Child.

> The heightened burden of proof imposed on those seeking a declaration of abandonment in an adoption case is another safeguard against a wrongful termination of a biological parent's parental rights.  Unlike most civil cases that require proof by a preponderance of the evidence, adoption cases require the party asserting that a parent has abandoned his or her child to prove their case by clear and convincing evidence.  [Citations omitted].
> The use of a heightened standard reflects the importance of the public and private interests affected by an adoption as well as the community's judgment concerning the allocation of the risk of error between the litigants.....It instructs the fact-finder concerning the degree of confidence the community believes that the fact-finder should have in the correctness of its conclusions.  [Citations omitted].

*O'Daniel v. Messier*, 905 S.W. 2d 182 at 187 (Tenn. Ct. App. 1995).

The testimony at trial established that it would be in the best interest of Minor Child to have Father's and Mother's parental rights terminated.

### V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Trial Court.  This matter is remanded to the Trial Court for such further proceedings as may be necessary consistent with this opinion and collection of costs below.  Costs on appeal are adjudged against the Appellant, Timothy Pelfrey, and his surety.

---

[6]Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child. . .

[7]"Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.. . .

_____
HOUSTON M. GODDARD, PRESIDING JUDGE