# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## IN THE MATTER OF B.B.

### Direct Appeal from the Juvenile Court for Davidson County
### No. 9719-0003807      Burton Glover, Judge

---

### No. M1999-00643-COA-R3-CV - Decided June 20, 2000

---

The trial court terminated the mother's parental rights to B.B. on the grounds that: (1) the child had been removed from the mother for more than six (6) months and the conditions which led to removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect still persisted; (2) the mother substantially failed to comply with the plan of care established by the Department of Children's Services; and (3) the mother was incompetent to adequately provide for the further care and supervision of the child. Because clear and convincing evidence supports the trial court's findings and its conclusion that termination was in the best interest of the child, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed and Remanded

COTTRELL, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S. and KOCH, J., joined.

Jennifer Lynn Thompson, Nashville, Tennessee, for the appellant, Lisa Ann Mears.

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

This case involves the termination of the parental rights of the mother of B.B., a minor child born in May 1991.[1] The trial court terminated the mother's parental rights after finding that: (1) the child had been removed from the mother for more than six (6) months and the conditions which led to removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect still persisted; (2) the mother substantially failed to comply with the plan of care established by the Department of Children's Services ("DCS"); and (3) the mother was incompetent to adequately provide for the further care and supervision of the child. For the

---

[1]B.B.'s father surrendered his parental rights in September of 1998.

following reasons, we affirm.

B.B. was placed in State custody on October 7, 1997, after DCS filed a petition for custody and emergency removal. The petition alleged that B.B. was at serious risk because her mother, the petitioner herein, had threatened to kill her.[2] The petition stated:

> The mother . . . is unable and unwilling to care for . . . [B.B.] at this time due to ongoing mental health issues. [B.B.] is ADHD and oppositional defiant . . . Home Ties was placed in the home in August. They recognized that [the mother] had mental health issues and made a referral to Mental Health Coop.

A removal order was issued the day the petition was filed and a hearing date was set. The next day, B.B.'s mother was hospitalized for mental health treatment. Shortly thereafter, counsel was appointed for B.B.'s mother and a guardian ad litem was appointed for B.B. After an October 10, 1997 hearing, the trial court found that the parties agreed that B.B. would remain in DCS custody, while B.B.'s grandmother explored the possibility of assistance from the family. The court reported that DCS would prepare a comprehensive plan of care and would attempt to place B.B. so that she could continue at the special school she had been attending. The court also directed DCS to work closely with the grandmother to assess whether B.B. really needed to stay in State custody.

DCS formulated a plan of care which was staffed on November 6, 1997, and agreed to by the mother, grandmother, and guardian ad litem for the child. Its stated goals were to reunite the child with her mother or place her with a relative. The plan recognized B.B.'s diagnoses of oppositional defiant disorder and attention deficit disorder as well as her behavioral problems, and incorporated requirements for continued treatment, including medication and counseling. The plan also contemplated various medical examinations, continued placement in a school with special education classes, and transportation from her foster home to the school. The plan permitted weekly visits with her mother at her grandmother's home. The plan also recognized the mother's diagnosis of severe depression and required the mother to continue the medication prescribed by her psychiatrist and to access other mental health services with the goal that she become stable enough to resume caring for B.B. Metro Mental Health Coop and DCS were to monitor mother's performance and assist with obtaining needed services.

A second hearing was held on November 17, 1997 for settlement and presentation of the plan of care. At that time, the court found that B.B. was doing "very well" in the foster home. During this hearing, the parties reported that the case had been settled. The court subsequently made findings that B.B. was a dependent and neglected child in that her mother suffered from severe depression which rendered her incapable of parenting the child. The court stated that B.B.'s attention deficit disorder and hyperactivity exacerbated the mother's inability to parent B.B. The court therefore ordered B.B. to remain in the custody of DCS, and continued supervised visitation with the mother and

---

[2]According to the record, B.B. told two teachers that her mother had threatened her with a knife. The mother purportedly stated that she would kill B.B. if B.B. did not leave home.

grandmother. The court further stated:

> The mother shall continue to cooperate with Mental Health Coop and her psychiatrist, Dr. Rosenshein, and shall continue to take her medication as prescribed, and shall continue to follow the Plan of Care so that the goal can remain reunification.

The case was heard again on February 20, 1998, pursuant to the court's earlier order for a ninety-day review. The court found that B.B.'s behavior had improved and that the foster mother had reported that B.B. was a "delightful child." The court found that B.B. was on Ritalin, had started counseling, and visited her grandmother and mother every weekend, staying for a day and sometimes all night. It noted that the mother was taking medication for depression and co-dependent personality and was continuing to go to Metro Health Coop and to see her psychiatrist. The court also advised the grandmother that the family needed to decide if anyone in the family could provide a permanent home for B.B.

After another hearing to review the foster care placement on May 18, 1998, the court found that the mother was undergoing psychological evaluations but had been either unable or unwilling to answer the questions on the written portion of the test. The court also noted that the foster mother and B.B.'s counselor had reported that the child exhibited more behavioral problems after overnight visits with the mother and grandmother. The grandmother reported that no one else in the family could take B.B. and that her own health problems created a difficulty in her taking B.B. The trial court determined that progress toward the goal of returning B.B. to her mother was not appropriate and that the goal needed to be changed. The court ordered a new staffing and a revised plan.

After a June 24 hearing, the trial court entered a permanency planning order in which it reported that the mother's psychological examination demonstrated that she could not care for B.B. The court determined that progress on the goal of reuniting B.B. with her mother was inappropriate and needed to be changed to adoption or relative placement. The court ordered that the new staffing be held immediately. The above mentioned evaluation[3] concluded with a recommendation that the child not be returned to the mother's care at that time on the basis that the mother "does not have some of the basic qualities necessary for even adequate parenting."

After a July 27 hearing, the trial court entered a permanency planning order which approved changing the plan of care goal from reunification to adoption.[4] DCS had reviewed the revised plan of care with the mother and the grandmother. B.B.'s guardian ad litem concurred in the change in

---

[3]The mother, who was of borderline intellectual ability, had also tested "significantly high" for child abuse potential. The test showed that the mother "endorses numerous traits known to be present in physical child abusers," although the report noted that "no test can actually predict abusive behavior."

[4]The order included a statement that the grandmother reported that the mother did not attend the hearing because she gets upset in court.

goal. Supervised visitation between mother and daughter was subsequently reduced to one hour per week.

DCS filed a petition to terminate the parental rights of the mother on October 27, 1998. The hearing on the petition was held on February 9 and on March 11, 1999. The court specifically applied Tenn. Code Ann. § 36-1-113(g)(3)(A), finding that B.B. had been removed from her parent for over six months and the conditions which led to removal or other conditions which in all reasonable probability would cause further abuse or neglect still persisted and there was little likelihood that these conditions would be remedied. The court found that the continuation of the legal relationship between parent and child greatly diminished the child's chances of early integration into a stable and permanent home. The court also found that the mother failed to follow the foster care plan, which the court found to be reasonable and related to remedying the conditions which necessitated foster care. In addition, the court applied Tenn. Code Ann. § 36-1-113(7)(B)(i), finding that the mother was incompetent to adequately provide for the child's further care and supervision because her mental condition was impaired, and likely to remain so, to the extent that it was unlikely that she would be able to resume care of the child in the near future. The court determined that the mother had failed to make an adjustment of circumstances, conduct, or conditions so as to make it in the child's best interest to return home, that the mother failed to maintain regular visitation or other contact, that the mother failed to pay any portion of substitute physical care and maintenance, and that there was no meaningful relationship between the mother and child. The court specifically found that the mother had failed to effect a lasting adjustment after reasonable efforts by social agencies "for such a duration of time that lasting adjustment does not reasonably appear possible." The court terminated the mother's parental rights and awarded custody, control, and guardianship to the State of Tennessee.[5] The mother then commenced this appeal, based solely on a claim that the evidence preponderates against the trial court's finding that grounds for termination were shown by clear and convincing evidence.

## I. Standard of Proof

Because the decision to terminate parental rights affects fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* Tenn. Code. Ann. § 36-1-113(c)(1) (Supp. 1999); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Evidence which satisfies the clear and convincing standard "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *O'Daniel*, 905 S.W.2d at 188. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re*

---

[5]In addition to the grounds found to exist by the court, the petition also alleged that the mother had willfully abandoned B.B. for more than four (4) consecutive months preceding the filing of the petition in that she failed to support the child. That ground did not form a basis for the trial court's termination and is not an issue in this appeal.

*M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Parental rights may be terminated in only a limited number of statutorily defined circumstances. Before termination, one or more of the asserted statutory grounds must be proved by clear and convincing evidence and the court must determine, also by clear and convincing evidence, that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1999).

The mother argues that the trial court erred in finding clear and convincing evidence of a factual basis to terminate her parental rights. The trial court based its decision to terminate the mother's parental rights on three subsections of Tenn. Code Ann. § 36-1-113.[6] We must affirm the trial court's judgment if any one of these bases exists in this case.

## II. The Evidence

The record shows that B.B. was removed from the parental home because the mother was unable or unwilling to provide care for B.B. due to mental health issues. The mother had been suffering from depression for a number of years. She had been receiving social services, through the Home Ties program and other agencies, even before the removal. The record shows that the mother specifically declined to follow the recommendations of the Home Ties representative in handling B.B. The record also shows that B.B. had significant behavioral problems related to her diagnoses with oppositional defiant disorder and attention deficit disorder. B.B. had been attending a special needs school and was receiving counseling and other services. The mother had failed to cooperate in parenting classes and other counseling related to B.B.'s needs.

After B.B. was removed from the home, DCS established a plan of care with the stated goal of reunification of mother and child. The plan required the mother to continue seeing a psychiatrist, continue taking medication for her condition, and continue using Metro Mental Health Case Management. The representative from DCS testified that the mother provided no proof that she had complied with any of these directives. On the contrary, the mother admitted that she had maintained her medication "off and on" even though she was aware that compliance with the plan was necessary for reunification. The mother also admitted that she saw the psychiatrist only sporadically and had ceased her relationship with Metro Mental Health.

At trial, the DCS representative testified that the mother had not taken advantage of the services, such as parenting classes, that Home Ties offered. He stated that "more than once" he sought parenting instruction for the mother at the Mental Health Coop, but the mother refused to go there, notwithstanding the fact that she was offered door to door transportation. The DCS representative reported that the mother essentially avoided him, to the point that he was unable to

---

[6]Although the court's order specifically refers to only two of the statutory grounds by citation to code section, the trial court's finding that the mother did not follow the plan of care relates to an additional statutory ground, Tenn. Code Ann. § 36-1-113(g)(2), as alleged in the petition.

inspect her residence to determine whether she was maintaining it properly. No family placement was available; the grandmother testified at trial that neither she nor either of mother's sisters could take custody of B.B.

The DCS representative testified that the conditions which precipitated B.B.'s removal from the home, or other conditions, which in all reasonable probability would subject the child to further abuse or neglect and prevent the child's return still persisted. The DCS representative expressed apprehension about the mother's mental health:

> I'm concerned that she retreats into her own little world and becomes no longer approachable so the social service workers like myself or from Mental Health Coop can't approach her with services. I can see that as a great danger. I believe that the child would return to her and she would retreat into this shell, for lack of a better word, that the child would be at risk. . . . You know, it's hard for me to sit here and say this, but I just don't believe that the child would be safe with her, you know, in a situation where both parties, both have got such tremendous needs.

As previously noted, shortly after B.B. was removed from the home, her mother was admitted to a psychiatric care hospital. She received diagnoses of major depression, recurrent with psychotic features, and dependent personality disorder. During this admission, it was reported that the mother had been treated in the past for major depression and had been "very noncompliant with medications generally and with treatment." The mother was also hospitalized after a purported suicide attempt during the week prior to the first day of the termination hearing. The mother denied that she had attempted suicide, but reported that she was glad for the intervention because she got started back on her medication. She testified she had been compliant with her medication for approximately one week before the first day of the hearing.

After removal of B.B., DCS arranged for a psychological evaluation of B.B.'s mother. The psychologist who performed the evaluation testified that he had been asked to perform the evaluation because there were questions regarding the mother's intellectual functioning and parenting ability raised by the mother's history of referrals and interventions. The psychologist testified that the mother scored in the borderline range in intellectual performance, but concluded that the mother's intellectual functioning alone would not interfere with effective parenting although her psychological problems would prevent her from parenting appropriately.

He reported clear and striking contradictions in the mother's descriptions of B.B. and in her descriptions of her own parenting ability. In particular, he noted that the mother's answers on the Parenting Stress Index indicated she perceived herself as having no problems in parenting and perceived B.B. as having no problems. These answers, however, were contradictory to other statements by the mother. The evaluation stated that:

> [The mother] has a rigid and overly simplistic cognitive style in which important elements in the environment are ignored in decision-making. She has virtually no skills in dealing appropriately with negative emotions and is at risk for impulsive and

damaging behavior when under stress. A striking self-centeredness is indicated in which it will be very difficult to put others' needs before hers. Immaturity is indicated in which a child's actions are likely to be taken personally when appropriate parenting would call for distancing and objective thinking in responding.

The psychologist concluded that the mother's "very maladaptive cognitive style" interfered with her ability to interact with her environment on most levels. He characterized the mother as at risk for being overwhelmed by even minimal stress and observed that she used most of her mental energy to deny or avoid negative feelings and had difficulty dealing effectively and appropriately with her emotions. According to the psychologist, the mother avoided facing emotion, and didn't take in enough evidence of her environment to make proper decisions or show proper judgments. He predicted that attempts to force her to consider other people or pay attention to other things would likely trigger irritability and she would have an especially difficult time trying to parent a child as difficult as B.B. After explaining that the mother's social isolation removed one method of dealing with stress, he psychologist stated, "Her social skills being weak and her emotional skills being weak are the two biggest things that tell about parenting."

According to the psychologist, the results from the test suggested that providing intervention to correct the significant problems in the mother's functioning would be extremely difficult. He explained that the mother's difficulties were not the result of psychological stresses "but they are characterological, deeply ingrained difficulties dealing with people, dealing with emotions, and dealing with stress." He was pessimistic that changing her environment would result in significant changes. The psychologist also testified that improvements in the mother's functioning would be difficult to effect because she did not perceive that any of the problems she experienced in parenting B.B. were her fault or that she had any significant problems, except depression. The psychologist concluded that the mother's mental condition was so impaired and likely to remain so impaired that she would be unable to resume care and responsibility of B.B. in the near future.

Another psychologist, who had treated the mother in the two months prior to the hearing, also testified. Her initial diagnosis of the mother, having performed no psychological evaluation, was major depression with recurrent psychotic features. According to the psychologist, that diagnosis is normally treated with medication, psychotherapy, and family education. She reported that stabilization through medication often takes a number of months if the patient is compliant, but the mother had reported a history of noncompliance with treatment. The psychologist had referred the mother to a psychiatrist, who prescribed some medications, all of which the mother refused to accept. This psychologist saw the mother only once before she was involved a crisis intervention about a week before the hearing when the mother, depressed about the prospect of losing contact with B.B., became self harmful. The mother was placed in respite care for three days, although the psychologist had recommended hospitalization for a month in order to stabilize her medications.

The psychologist testified she would like to see the mother continue the course of medication she was on, continue in psychotherapy, and undergo social skills training. If the mother were to treat her mental health issues consistently for at least six months and participate in appropriate education, this psychologist thought there was a possibility the mother could become able to parent her child.

If the mother did not treat those issues, there was no possibility. The psychologist agreed that the mother needed to take care of her own needs in order to be able to care for her child.

The record shows that initially, the mother seemed uninterested in getting treatment; however, at trial she expressed a desire to maintain her medications. The mother did not comply with psychiatrist's medication recommendations made approximately one month before the hearing. The record shows that the mother has a long history of resistance to treatment and her condition, with the additional stresses of a child with special needs, could, in the opinion of the psychologist, place her at risk for homicidal and suicidal ideation if left untreated.

### III. Termination under Tenn. Code Ann. § 36-1-113(g)(3)(A)

We first examine the record for clear and convincing proof of the criteria enumerated in Tenn. Code Ann. § 36-1-113(g)(3)(A) as grounds for termination of parental or guardianship rights:

> (3) (A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>>
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

It is undisputed that B.B. has been removed from the home by court order for over six (6) months. She was removed in October of 1997 because her mother's mental condition prevented the mother from appropriately caring for B.B. The petition for termination of parental rights was filed in October of 1998, and the trial was held in February and March of 1999.

Having considered this record, we find that clear and convincing evidence supported the trial court's conclusion that the conditions which led to B.B.'s removal or other conditions which in all reasonable probability would cause her to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the mother still persist. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 1999). Nothing in the record shows a likelihood that these conditions will be remedied at an early date so that the child could be returned safely to the mother in the near future. On the contrary, the record shows that the mother had a history of failing to take her

medications or to undergo regular psychological treatment, as required by the plan of care and as necessary to enable her to prepare to parent a child. Further, the mother has demonstrated an unwillingness to consistently avail herself of social services needed by her and by B.B. During the period since B.B. was removed from the home, these problems were not rectified. The mother attended no parenting classes, and pursued no other regular instruction to improve herself or her relationship with her daughter. She did not continue regular psychiatric treatment or take medication prescribed for her condition. We see no evidence that the mother is in any better position to parent B.B. now than she was at the time the child was removed from her home. The record also contains no evidence that B.B.'s grandmother and aunts would provide any greater assistance with the child than they did before her removal from the home.

Nor can we say the trial court erred in finding that the continuation of the parent and child relationship greatly diminished B.B.'s chances of early integration into a safe, stable and permanent home. The foster mother testified that her family loved B.B. and they had not ruled out adoption. The record shows that the stability provided B.B. in the foster home had improved her mental health and behavior. This child, who has special problems of her own, needs a stable environment which the mother cannot provide.

We are not persuaded that the mother's last minute willingness to take her medication as prescribed alters the conclusion that there is little likelihood that the mother's inability to parent B.B. would be remedied at an early date so that B.B. could safely return to the mother in the near future. The mother's history and the experts' prognosis for improvement in her condition which would allow her to properly care for her child compel us to agree with the trial court that return of B.B. to the mother is not likely to be possible anytime in the near future.

A parent's failure to make fundamental adjustments which could make a safe return of a child possible is a basis for termination. *See State v. Hunter*, No. M1999-02606-COA-R3-CV, 2000 WL 313549 at *4 (Tenn. Ct. App. March 29, 2000) (no Tenn. R. App. P. application filed).

IV. Termination under Tenn. Code Ann. § 36-1-113(g)(2)

Tenn. Code Ann. § 36-1-113(g)(2) permits termination of parental rights when

[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

As noted above, the mother failed to comply with several aspects of the plan of care, all of which directly affected her ability to effectively parent B.B. The plan of care required the mother the

obtain treatment for her mental health problems, continue taking her medications for treatment of her mental health problems, and continue using Metro Mental Health Case Management. It also required her to maintain her home in a clean, habitable condition, to pay child support, and to attend parenting classes. The record contains no evidence that the mother seriously pursued any of these aspects of the plan of care. During the time the plan of care was in effect, she did not seriously and regularly obtain mental health care. In addition, she severed her ties with Metro Mental Health, refused to take her medications for any meaningful length of time, and failed to take parenting classes. The record shows that she evaded the DCS representative who came to inspect her house. Although she had begun taking her medications immediately before the termination hearing and was communicating occasionally with a psychologist, "[t]oken attendance [in counseling session and token maintenance of medication] without addressing the real issues present here [are] not sufficient to indicate compliance with the foster care plan." *Dep't of Human Servs. v. Adams*, No. 03A01-9403-CV-00114, 1994 WL 579911 at *9 (Tenn. Ct. App. Oct. 24, 1994) (no Tenn. R. App. P. 11 application filed). Based on the evidence, we cannot say that the trial court erred in finding by clear and convincing evidence that the mother had substantially failed to comply with the plan of care.

## V. Termination under Tenn. Code Ann. § 36-1-113(g)(7)(B)(i)

Nor can we say that the trial court's decision to terminate the mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(7)(B)(i) was erroneous. That subsection permits courts to terminate parental rights if they determine on the basis of clear and convincing evidence that:

> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future . . .

Here, the record shows that the mother was diagnosed with major depression with psychotic features. Her treating psychologist testified that someone with this diagnosis is more at risk for homicidal and suicidal ideation and the additional stress of having a child with special needs would increase that risk.[7] The doctor advised that the mother could not resume custody of B.B. until she had complied with treatment for a minimum of six months, and then only a possibility she would be able to parent the child would exist. The record shows that the mother had always resisted medical treatment to varying degrees and had not continued her medication for any meaningful length of time. In addition, psychological testing raised questions about the mother's ability to parent the child. This evidence is sufficient to justify the trial court's conclusion that the mother was incompetent to adequately provide for the further care and supervision of the child because her mental condition was so impaired.

---

[7]This psychologist testified at the February 9, 1999 hearing that she had been treating the mother since December.

Our Supreme Court has held that mental illness which makes a parent unfit for care for a child can constitute grounds for termination of parental rights. *See State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990). In reversing a Court of Appeals decision to the contrary, the Supreme Court stated:

> The holding of the Court of Appeals in this case - - that "mental disability" can not be the basis of termination of parental rights since the acts of the mentally disabled parent are not willful - - would nullify a significant part of the legislative plan for the welfare of dependent and neglected children. An obvious result of the holding is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home.

*Id.*

The evidence in this case, primarily the mother's history of noncompliance with medication and treatment recommendations and the psychologists' description of the mother's condition, supports a finding that her condition is likely to remain so impaired as to prevent her from adequately parenting the child.

## VI. Best Interest of the Child

The legislature has stated that "[i]n all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . ." Tenn. Code Ann. §36-1-101(d) (Supp. 1999). Further, Tenn. Code Ann. § 36-1-113(c) requires that termination of parental rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination or [sic] parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Having found that the grounds for termination were properly established, we turn to the fundamental question of the best interest of the child. Factors to consider in making that determination include:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact

-11-

with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 1999).

We find abundant evidence showing that the mother failed to adjust her conduct so as to make it safe and in B.B.'s best interest to be in her home at present. *See* Tenn. Code Ann. § 36-1-113(i)(1). It is likewise clear from the evidence before us that the mother failed adjust her circumstances, conduct or conditions to make it in B.B.'s best interest to return to her in the foreseeable future. The mother failed to effect a lasting adjustment after reasonable efforts by social agencies to bring about change. *See* Tenn. Code Ann. § 36-1-113(i)(2). Nor does a lasting adjustment appear reasonably possible. *See Adams*, 1994 WL 579911 at *9. Notwithstanding the facts that B.B. had been removed from the home for over a year and the mother had been informed that treatment for her mental condition was necessary for reunification, at the beginning of the termination hearing, the mother's track record for taking her medication was approximately one week. The mother failed to continue in counseling, or seek parenting instruction. The record shows that the mother refused to take responsibility for her failure to comply with many of the suggestions made by DCS, blaming various social service agencies. The mother's failure to make the adjustments of conduct urged by DCS and her care givers assured that the conditions in her home that led to the court's determination that B.B. was a "dependent and neglected" child would not change. *See Smith*, 785 S.W.2d at 339. Further, clear and convincing evidence established that B.B. needs a stable, permanent home. *See id.* The record shows that B.B. has thrived in the stable environment of her foster home and that she has been able to receive the treatment and other services she needs for her own significant problems. The General Assembly has decided that the child's need for a permanent, stable, and safe environment must outweigh a parent's interest in retaining parental rights where those two interests conflict. *See Smith*, 785 S.W.2d at 338. As this court observed in *Adams*:

Based upon the record before us, if we do not affirm the Judgment of the trial court, we would place the children in an endlessly hopeless situation, caught in the system

with no escape. . . . The children need and deserve a chance to thrive and grow in a loving permanent home that offers them the opportunity to reach their fullest potential, despite the neglect and abuse they suffered in early childhood.

*Adams*, 1994 WL 579911 at *10.

Under these circumstances, we must conclude that the trial court did not err in finding that termination was in B.B.'s best interest.

## VII.

Accordingly, we affirm the trial court's decision. This cause is remanded for such further proceedings which may be necessary. Costs of this appeal are taxed to the mother, for which execution may issue if necessary.