IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 16, 2001

# IN THE MATTER OF: C.J.S., D.O.B. 7/11/95
# CHILD UNDER THE AGE OF EIGHTEEN (18) YEARS

Appeal from the Juvenile Court for Rutherford County
No. 27667J     Ben Hall McFarlin, Jr., Judge

---

No. M2000-02836-COA-R3-JV - Filed February 22, 2002

---

A.E.S. is the mother of C.J.S., who has been in foster care for four of his five years. At the State's petition, the trial court terminated these rights based upon A.E.S.'s mental incapacities. A.E.S. appealed this decision arguing that the grounds for termination were not proven by clear and convincing evidence. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Gregory M. Reed, Murfreesboro, Tennessee, for the appellant, A.E.S.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.

A.E.S. gave birth to C.J.S. on July 11, 1995. A.E.S. was unmarried and the identity of C.J.S.'s father is unknown. A.E.S. was mentally disabled at the time of C.J.S.'s birth and remains so. She has been diagnosed as a paranoid schizophrenic with mild mental retardation.

The Department of Children's Services ("DCS") took custody of C.J.S. for the first time in October of 1995 when he was three months old. At that time, A.E.S. was out in the street with C.J.S. in a stroller yelling that she had been beaten and he had been burned. He was returned to A.E.S. in December of 1995, but had to be removed again early in 1996 when A.E.S. got off her medication. Again, he was returned to A.E.S.'s custody, but in December of 1996 C.J.S. was taken away for a

third and final time. On this occasion, A.E.S. was in the Rutherford County Guidance Center (the "Guidance Center") reportedly slipping in and out of a catatonic state.

DCS attempted to find a family member to take care of C.J.S., but no one would agree to care for him. C.J.S. was then placed in a foster home with Ms. Puckett. Ms. Puckett subsequently suffered a small stroke and her daughter, Ms. Gaines is the current foster mother.

DCS filed a Petition for Termination of Parental Rights on February 28, 2000. At the hearing A.E.S. stated that she does not understand money, she forgets to take her medicine, she will not cross the street alone and runs out of money at the end of the month. The Guidance Center pays her bills and sends her money when she needs it. The Guidance Center also does a monthly blood test to test her medication levels. She gets her medicine weekly at the STEPS program or from her therapist. Sometimes she has missed her transportation, arranged by the Guidance Center, and, therefore, has not gotten her medicine. She lives in a one bedroom apartment, which, along with her other financial support is supplied by a public agency.

There were various case managers throughout the four years C.J.S. was in custody. The first to testify was Ms. Touchere Johnson, who became the residential case manager on February 28, 2000. She stated that she supervises the visits between C.J.S. and A.E.S. and is the case manager for the foster parents' needs. She has observed that there is not much interaction between mother and child. A.E.S. will sit and watch C.J.S. play until she is instructed by the case manager how to play with him. A.E.S. does assist C.J.S. with going to the bathroom and getting something to eat. C.J.S. does not call A.E.S. his mother. Ms. Johnson recalled an event where A.E.S. told C.J.S. she was his mother and C.J.S. denied this. He calls Ms. Puckett, his original foster mother, "mom." Ms. Puckett's daughter, Ms. Gaines is C.J.S.'s current foster mother and wants to adopt him. Ms. Johnson was particularly concerned about A.E.S.'s ability to care for C.J.S. because he stays up until 12:00 a.m. or 1:00 a.m. and is up again at 5:00 a.m. She also stated that C.J.S. needed active involvement regarding school. On cross-examination, she did state that she never observed any violent or abusive behavior by A.E.S. and that A.E.S. was always caring and loving toward the child.

Melissa Bullard became the case manager for the child and family on April 10, 2000. She worked to set up services for both C.J.S. and A.E.S., such as parenting classes. She also supervised visits between C.J.S. and A.E.S. She testified to essentially the same information as Ms. Johnson. She also stated that she did not believe A.E.S. was capable of caring for C.J.S. because of her limited capabilities. Ms. Bullard had not made many services available for A.E.S. because many services were already in place through the Guidance Center and the STEPS program when she took over the case.

Ms. Sherry Hill was the case manager from October of 1995 to October of 1997. She was the case manager when C.J.S. first came into State custody. She stated that when C.J.S. was returned to his mother after the first episode, services were put into place for her by the Exchange Club. Included in those services was the STEPS program. This program was to help with daily activities such as shopping and helping her with her money. C.J.S. came into State custody again because A.E.S. had gotten off of her medication. He was again returned home with services for the mother.

C.J.S. then came into State custody the final time because A.E.S. was lapsing in and out of a catatonic state. The mother was on medication at the time this incident occurred. Ms. Hill testified that the visits she supervised between the mother and child did not involve much interaction. A.E.S. would watch C.J.S. play. A.E.S. was not able to interact with him and help him develop social skills. Ms. Hill never felt comfortable during her time as case manager with returning C.J.S. to A.E.S.'s custody. She was concerned about A.E.S.'s lack of interaction with C.J.S. and was concerned for his safety. Ms. Hill testified that she had observed C.J.S. in Ms. Puckett's foster home and that he depended on her for his needs. She believed they had a good relationship. Ms. Hill also went over the procedure for termination of parental rights with A.E.S.

Debora Prytula, the case manager from October 1998 to February 2000, also testified at the hearing. In her position as case manager, she was assigned to work with both the mother and the child. She supervised a few visits between mother and child and noted the lack of interaction between the two. She also testified that there was no record of visitation from October 1999 to March 2000, which includes the four months preceding the filing of the petition to terminate parental rights.

The former residential case manager from November 1997 to January 1999, Doris Hoffman, testified that A.E.S. was having unsupervised visits in her home for about four hours at a time. The court's goal in allowing the unsupervised visits was to make sure that A.E.S. was not capable of caring for C.J.S. Ms. Hoffman testified that A.E.S.'s home was very cluttered. There was a problem with pests and food left out. A.E.S. often appeared disheveled. Some days, A.E.S. would be all fixed up and other days she would appear to be unaware of what was going on. She also stated there were several times when she had to wake A.E.S. when she brought C.J.S. for his visits.

A.E.S. and an acquaintance from her church testified on A.E.S.'s behalf. Annette Smart testified that she was in a bible study with A.E.S. She stated that the women in the bible study were willing to help A.E.S. anyway they could. She also stated that she had only know A.E.S. for three weeks, had never been to her house, and had seen but never met C.J.S.

Recalled to the stand, A.E.S. testified to many of the same things that she had before. She stated that she had had no more fainting episodes and that she was taking her medicine. However, she did admit that she did not know what her medications were treating. She also stated that C.J.S. talked to her sometimes, and sometimes he did not. When he does not talk to her, she does not talk to him. He does not call her mommy. She also admitted that she was doing the best she could and trying her best when C.J.S. was removed.

The trial court made the following findings of facts:

1.      [C.J.S.] has been in custody four years out of his five years.
2.      [A.E.S.] suffers from paranoid schizophrenia.
3.      [A.E.S.], when not taking her medications hears voices and hallucinates.

-3-

4. [A.E.S.] has not always taken her medications as prescribed and on at least one occasion stopped taking her medications on her own.

5. [A.E.S.] does not know her income.

6. [A.E.S.] cannot cross the street without help.

7. [A.E.S.] cannot tell time on a regular clock, it must be digital.

8. [A.E.S.] cannot care for herself without extensive daily intervention with community services.

9. Without it being her fault, [A.E.S.] is doing excellent to take care of herself, and looked good today. It takes everything she has twenty four hours a day, seven days a week to take care of herself.

10. [A.E.S.] loves [C.J.S.] very much and has not been abusive to him in any way, physically or mentally.

11. [A.E.S.] has been in at least four different mental hospitals in the last five years.

12. Three months is the longest period of time that [C.J.S.] lived with [A.E.S.].

13. There is no abandonment in that [A.E.S.] provided the best visits that she could for her son.

14. The Department of Children's Services made appropriate and reasonable efforts to locate relative and family resources to no avail.

15. [A.E.S.] has been going to church for three weeks but no [sic] long enough to consider [C.J.S.] to be safe and secure and not long enough to have a safe support network through church.

16. This matter is a complex and lengthy case.

17. [A.E.S.] had extremely competent counsel appointed for her in this case.

18. That in terms of best interest, [A.E.S.] has not made such an adjustment of circumstances, conduct, or conditions as to make it in the child's best interest to return to her home in the foreseeable future; she has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible; and the Court has considered the effect of a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition; that the physical environment of the parent's or guardian's home may not be healthy and safe, and [A.E.S.'s] mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child.

The juvenile court judge concluded that A.E.S.'s parental rights should be terminated. She appeals this decision.

## II.

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *Nale v. Robertson*, 871 S.W.2d 674 (Tenn. 1994). Under Tenn. Code Ann. § 36-1-113(g)(3) a termination proceeding may be initiated if the child has been removed from the home for at least six months, and:

> (i) The conditions which led to to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii). To terminate parental rights the State must show by clear and convincing evidence that grounds exist for the termination and that it is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1) & (2); *In re Drinnon*, 776 S.W.2d 96 (Tenn. Ct. App. 1988). Clear and convincing evidence is evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

**III.**

The appellant's first issue is whether the trial court erred in its finding that the State proved by clear and convincing evidence that the condition which led to C.J.S.'s removal persists as required under Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). The condition which led to C.J.S.'s removal, according to the Petition for Termination of Parental Rights was that, "the mother continually demonstrated that she could not meet the child's needs despite assistance from the Department for a period of 14 months prior to the child's third removal from the mother's care." Our Supreme Court has held that mental disability can be the basis for the termination of parental rights. *State v. Smith*, 785 S.W.2d 336 (Tenn. 1990).

The State has clearly proven through the testimony at the hearing that A.E.S.'s mental condition still prevents her from meeting C.J.S.'s needs. A.E.S. is barely able to take care of herself with massive outside assistance. She does not pay her own bills, often runs out of money, must have transportation provided, and has problems making herself presentable. In addition, at the visitations A.E.S. does not interact with her child until instructed how to do so. It is apparent from the testimony at the hearing, that A.E.S. has difficulty meeting her own needs, much less those of an active, growing five-year-old boy at the time of the hearing. A.E.S. has clearly not learned the skills she needs to care for C.J.S. without constant supervision. Therefore, we find there is clear and convincing evidence that the condition which led to C.J.S.'s removal persists.

## IV.

The appellant's second issue is whether the trial court erred in its finding that the State proved by clear and convincing evidence that the condition which led to C.J.S.'s removal is unlikely to be soon remedied as required under Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). It is also clear from the testimony at trial that A.E.S.'s mental condition is unlikely to be remedied in the near future. A.E.S. has been diagnosed as paranoid schizophrenic and mildly mentally retarded. She will likely be on medication for the rest of her life. Her difficulties with taking care of herself, including taking her medication, is the main reason she lost custody of C.J.S. She has been the recipient of many forms of assistance for the four years preceding the petition, but there has been little improvement shown in her ability to care for herself and C.J.S. The proof showed that sometimes her abilities slightly improve, but then she suffers relapses. The proof is clear and convincing that there has been no consistent improvement in A.E.S.'s mental condition such that the condition would soon be remedied.

## V.

Appellant's third issue is whether the trial court erred in its finding that clear and convincing proof showed that the continuation of the legal parent-child relationship greatly diminishes C.J.S.'s chances of early integration into a stable and permanent home as required under Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Clearly, if A.E.S.'s rights are not terminated, C.J.S. will probably live in a foster home until he reaches the age of majority, and foster care, even good foster care, is not a substitute for a permanent home. C.J.S.'s current foster parent, the daughter of the woman he calls "mom" wishes to adopt him. Whether she should be allowed to do so we leave to a later determination. But as of now adoption appears to be C.J.S.'s only chance to be raised in a stable, permanent home.

We find that there is clear and convincing evidence to support the judge's decision that termination of A.E.S.'s parental rights was proper under the requirements of Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii). In addition to proving that grounds exist, the State must also prove that it is in the best interest of the child. In making a best interest decision the legislature has established factors for the courts to consider, one of which is found in Tenn. Code Ann. § 36-5-113(i)(8): whether "the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . ." This factor has also been shown by clear and convincing evidence.

This is a very unfortunate case. It is obvious from the record that A.E.S. cares about her son a great deal. However, the record shows by clear and convincing evidence that A.E.S. cannot take care of herself, much less C.J.S. There seems to have been some improvement in her situation, but not enough to warrant returning C.J.S. to her custody. Because we find that the grounds for termination of A.E.S.'s parental rights have been proven by clear and convincing evidence and that it is in the best interest of C.J.S. for those rights to be terminated, we affirm the juvenile court's decision.

We affirm the decision of the trial court. The cause is remanded to the Rutherford County Juvenile Court for any further proceedings necessary. Tax the costs on appeal to the appellant, A.E.S.

_____

BEN H. CANTRELL, PRESIDING JUDGE, M.S.