IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 18, 2006 Session

## IN THE MATTER OF M.A.W.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-02-1609-2     Arnold Goldin, Chancellor**

_____

**No. W2005-02095-COA-R3-PT - Filed May 25, 2006**

_____

In this termination of parental rights case, the juvenile court terminated the parental rights of T.H.W. ("Mother") and all potential fathers. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and WILLIAM H. INMAN, SP. J., joined.

Curtis D. Johnson, Jr., Memphis, Tennessee, for the appellant, T.H.W.

Paul G. Summers, Attorney General and Reporter and Douglas Earl Dimond, Senior Counsel, for the appellee, State of Tennessee Department of Children's Services.

## OPINION

### *Factual Background and Procedural History*

M.A.W. was born on July 25, 2000, to T.H.W. ("Mother") as sole guardian.[1] After M.A.W's birth, the hospital placed Mother with Bobby Jones, a woman who was interested in adopting M.A.W. and allowing Mother to stay with her while continuing to receive services from the hospital. However, Mother eventually became physically threatening to Ms. Jones and Ms.

---

[1]According to the Petition for Termination of Parental Rights filed by DCS, no person was named as the father of M.A.W. on the said child's birth certificate. Mother claimed that M.A.W's father was either L.W. or W.H., Jr. After personally serving W.H., Jr., notice and serving L.W. and other unknown fathers with notice through publication of the termination proceeding, the juvenile court granted DCS a default judgment after no party claiming to be M.A.W's father responded to the termination petition. Furthermore, after service of notice to all parties, the parental rights of L.W., W.H., Jr., and other potential fathers were again terminated in the final order terminating Mother's parental rights on June 22, 2005. Since none of the potential fathers has appealed either of these rulings, we will omit references to any potential father of M.A.W. and address exclusively Mother's involvement in the matter below.

Jones' daughter. Mother also threatened to harm herself and Ms. Jones feared that Mother might potentially harm M.A.W. as well. As a result, Ms. Jones called the police and, on August 7, 2000, M.A.W. was placed in a foster home by the Tennessee Departments of Children's Services ("DCS") while Mother was admitted to a mental healthcare facility. DCS subsequently filed a petition with the juvenile court, which eventually entered an order finding M.A.W. dependent and neglected, stating that Mother's mental disorders and apparent inability to maintain stable housing placed the child in danger.

On September 14, 2000, DCS developed a permanency plan which required Mother to attend parenting classes and demonstrate good parenting skills with M.A.W. Also, because Mother had behaved violently resulting in eviction from thirty-nine facilities, had threatened to kill a non-relative with whom she lived, had been diagnosed with a borderline personality disorder, and had an extensive history of unsuccessful mental health treatment, she was required to maintain appointments with her therapist, get ongoing mental health treatment, stabilize her mental status, and learn how to cope non-violently with others. The goal of the parenting plan was to return M.A.W. to Mother and the plan was approved on September 21, 2000. A second permanency plan was drafted on March 2, 2001, with terms analogous to those in the first parenting plan. This plan also required that Mother work to maintain a residence for an extended period of time. However, a progress report on September 18, 2001, documented little progress by Mother under either of the first two parenting plans during the year-long period after M.A.W.'s removal. Specifically, the report stated:

> [Mother]'s progress continues to be hampered by her not having a permanent residence, domestic violence[,] and her non-compliance with her medication. She has been hospitalized numerous of [sic] times during the last few months and she has been to jail for stabbing her paramour of which she has reported there is a long standing restraining Order of Protection against him. [Mother] is currently residing in the Seek For The Old Path Homeless Shelter following her being evicted from her last apartment. Case Management Inc., is attempting to work with her, however [Mother] refuses to do what is requested of her. [Mother] frequently solicits monies from the foster parents and others when visiting with [M.A.W.].

Due to Mother's failure to comply with the first two parenting plans, DCS developed a third permanency plan on September 18, 2001, which was substantially similar to the first two. As in the first two parenting plans, the goal was to eventually return M.A.W. to Mother. However, a progress report on March 19, 2002, stated that Mother still had problems with violence, still had trouble maintaining a residence for any extended time period, and had difficulty interacting with M.A.W. As a result, a fourth permanency plan was developed on August 20, 2002. The goal of this plan was for M.A.W. to be put up for adoption and for this process to be completed by August 2003. This plan stated that Mother had received a certificate of participation for adult outpatient treatment, had completed "common sense" parenting classes, and had been receiving services from a provider to assist her with finances and medication compliance. However, the plan also noted that Mother had difficulty maintaining a residence for

any extended period of time, had no insight into the needs of her child or how to address such needs, and had a history of noncompliance with prescribed medications. As a result, the fourth parenting plan required Mother to adhere to her medication schedule as prescribed, maintain stable housing, and attend supportive parenting classes to assist her in gathering insight into caring for her child.

Mother was incarcerated for aggravated assault and domestic violence on June 6, 2001, and again for violation of probation on December 2, 2002. Mother was subsequently incarcerated for forgery in Mississippi from April 25, 2003, until approximately May 14, 2004. Fifth and sixth permanency plans were drafted during Mother's incarceration in Mississippi. The fifth plan was executed on June 17, 2003, and duplicated Mother's responsibilities contained in the fourth plan. The sixth plan was executed on April 2, 2004, and contained no responsibilities for Mother. A seventh and final plan was developed on January 19, 2005. In this plan, Ruth Teegarten, Mother's DCS caseworker, noted that she was coordinating visits between Mother and M.A.W. and added that Mother had begun counseling with the Frayser Mental Health Clinic. This plan required that Mother continue her counseling, maintain her medications, attend all appointments, sign a release of information so that DCS could monitor her progress with mental health treatment, learn to manage her finances in order to provide for the financial needs of M.A.W., continue visiting M.A.W. pursuant to the court appointed visitation schedule, and refrain from further illegal activities and resulting incarceration.

At the time of the seventh permanency plan, Mother was living with Toby Parnell ("Mr. Parnell"), to whom Mother claimed she was married. Mother and Mr. Parnell had a history of domestic violence and Mr. Parnell also had a criminal history that included arrests for public indecency, forgery, and burglary. As a result, the seventh permanent parenting plan also required Mother to provide a marriage certificate and bring no unrelated persons to visits with M.A.W.[2] The seventh permanent parenting plan also noted that Mother was living in a home requiring extensive repairs, both to the structure itself as well as to the plumbing, and that Mother refused to let Ms. Teegarten into the home.

DCS initially petitioned to terminate Mother and the unknown father's parental rights on August 23, 2002. Parental rights to L.W., W.H., Jr., and any other potential unknown fathers to M.A.W. were terminated by default judgment on May 28, 2004. However, no trial on the issue of Mother's parental rights was conducted until July 13, 2005. However, as previously noted, DCS continued working with Mother during the interim period between the filing of the petition to terminate Mother's rights and the trial and drafted several permanent parenting plans. Before the trial began, Mother's counsel filed a motion in limine seeking to exclude the report prepared by Victoria Gillard, M.A.W's guardian ad litem. The juvenile court stated that it had not read the report and granted Mother's motion to exclude.

---

[2] Mother subsequently provide a marriage certificate indicating that she married Mr. Parnell on June 1, 2005.

At trial, Ms. Teegarten testified that Mother had been diagnosed with Post Traumatic Stress Syndrome and bipolar disorder. Ms. Teegarten further testified that she did not believe that, even if Mother remained compliant with her medication plan, Mother would be able to care for M.A.W. In regard to Mother's living situation, Ms. Teegarten testified that

> she still resides in a chaotic living situation. . . . She relates to me that the household, they never know from day to day what they're going to have to eat. Whether they're going to have utilities, whether they're going to have water. It's not a stable living condition.

Ms. Teegarten also expressed concern about Mother's continued relationship with Mr. Parnell, stating that Mr. Parnell had a criminal background and that there had been a history of violence between Mr. Parnell and Mother.

Regarding Mother's relationship with M.A.W., Ms. Teegarten stated that she supervised all of Mother's visits dating to 2004. While Ms. Teegarten testified that she believed Mother wanted the best for M.A.W., Ms. Teegarten stated that there was not much of a mother/daughter relationship between M.A.W and Mother and further testified that Mother had little success in taking charge of M.A.W. during visits. By contrast, Ms. Teegarten testified that Lynn and Rick Delgado (hereinafter referred to individually as "Mr. Delgado" or "Ms. Delgado" or collectively as "the Delgados"), M.A.W.'s foster parents, had a loving and nurturing interaction with M.A.W., who could be difficult at times to discipline. Ms. Teegarten further testified that the Delgados wished to adopt M.A.W.

Michelle Curet, Mother's case manager from Frayser Family Counseling Center at the Frayser Mental Health Center, testified that she had supervised Mother's case since October 2004. Ms. Curet testified that she had made home visits with Mother approximately one to three times per month. During her testimony, Ms. Curet stated that she had last visited Mother's home on June 13, 2005, and found no working utilities as well as dirty and malodorous conditions. Ms. Curet also testified that Mother had reported domestic incidents with her husband, Mr. Parnell, and had further confessed that she had gotten into trouble for stealing a food stamp card. In regard to Mother's living situation, Ms. Curet testified that from October 2004 until the date of trial on July 13, 2005, Mother had moved two times. Ms. Curet further noted that Mother had recently moved in with a friend after her home had been broken into.

When testifying about Mother's home life, Ms. Curet stated that Mother had difficulty managing her finances and, as a result, had problems keeping food around and her utilities turned on. However, Ms. Curet did testify that Mother had told her on the day of trial that the utilities at Mother's house were tuned back on. Ms. Curet also testified that Mother had been compliant with her appointments at the Frayser Family Counseling Center and appeared interested in working with Ms. Curet to better her living situation. However, despite Mother's interest, Ms. Curet testified that Mother's living situation had not changed since Ms. Curet began working with Mother.

Ms. Delgado testified at trial that she and her husband, Rick Delgado, had served as foster parents for M.A.W. since August 2000. During her testimony, Ms. Delgado stated that M.A.W became very distressed and suffered from night terrors before visits with Mother. Ms. Delgado also stated that, during visits with M.A.W., Mother acted in a "child-like" and playful manner and did not take charge of M.A.W. When questioned about Mother's relationship with M.A.W., Ms Delgado testified that she did not observe a maternal bond between Mother and M.A.W., and that M.A.W. considered Ms. Delgado to be her mother. In regard to the state of Mother's lifestyle, Ms. Delgado testified that nothing had changed with Mother since the Delgados took custody of M.A.W. When asked her intentions should the juvenile court terminate Mother's rights, Ms. Delgado testified that she and Mr. Delgado would like to adopt M.A.W., but did not seek to totally remove M.A.W. from Mother's life.

Mr. Parnell, Mother's husband, testified at trial concerning domestic violence incidents between he and Mother, and stated that Mother had been arrested for domestic violence two times. On the first occasion, Mr. Parnell testified that Mother was arrested for cutting him on the wrist. On the second occasion, Mr. Parnell testified that Mother was arrested for hitting him in the face with a stick. Besides the two incidents leading to arrest, Mr. Parnell further stated that he had thrown Mother out of their home three months before trial due to violent acts perpetrated against him by Mother. Although Mr. Parnell admitted that he and Mother had engaged in several altercations in the past, Mr. Parnell stated that he felt that their relationship had stabilized.

Testifying on her own behalf, Mother stated that she was a high school graduate, but had not worked in several years due to her disability, which included schizophrenia, borderline personality disorder, and seizures caused by frustration and anger. However, Mother testified that she was taking medication which controlled her seizures and that she had completed intensive outpatient treatment and a parenting seminar. Mother further testified that she was currently seeking psychological care at the Frayser Family Counseling Center and further indicated that she had complied in taking her prescribed medications since M.A.W's birth except for times when she ran out of it, which Mother stated occurred a couple of days a month until her doctor started giving her refills on her medication. However, despite her asserted compliance with her medications, Mother admitted that she still had difficulties getting along with people and had engaged in acts of violence against her husband and others.

When questioned about her criminal history, Mother testified that she had been incarcerated four times since M.A.W.'s birth. However, Mother denied that her April 2005 arrest was related to food stamps, instead stating that it resulted from a misunderstanding regarding a probation violation. When testifying about her living situation, Mother stated that she had been banned from approximately 39 shelters due to violent behavior. Mother also testified that she had been evicted twenty-nine times since M.A.W.'s birth. When questioned as to why she had been evicted so many times, Mother testified that the evictions occurred after friends had visited and gotten into verbal and physical altercations with Mother and her husband. When asked about her living situation on the day of trial, Mother testified she lived on a quiet and peaceful street,

and further asserted that her utilities had been turned on a few days before trial. However, Mother also testified that she was not living at the home, but rather staying with a friend, due to a recent break-in.

When testifying about her finances, Mother stated that she received $563 per month in disability and that her husband, Mr. Parnell, received $579 per month in disability. However, despite their combined income, Mother testified that she and Toby Parnell were unable to support themselves and indicated that she was searching for a part-time job. In regard to her relationship with Mr. Parnell, Mother testified that they had had four previous instances of domestic violence, but that they were addressing these problems and that the relationship had stabilized over the past year. However, Mother admitted assaulting Mr. Parnell three months before trial and further stated that she and Mr. Parnell continued to have verbal altercations "[p]robably two to every two days." When questioned about the care given to M.A.W. by the Delgados, Mother testified that the Delgados took good care of M.A.W. and further admitted that she could not say that M.A.W. would be better off in her care. However, Mother stated that she wanted to continue her relationship with M.A.W. even though she felt it was not in M.A.W.'s best interest to be in her home.

DCS also submitted the deposition of Dr. Patti Jordan ("Dr. Jordan") into evidence. Dr. Jordan testified that she had served as Mother's medication manager since January 21, 2005. Dr. Jordan also testified that during her first meeting with Mother in January 2005, Mother had auditory hallucinations, mood instability, anxiousness, tearfulness, decreased appetite, decreased energy, increased anger, and decreased concentration–all of which was consistent with psychotic illness. In assessing Mother's level of global functioning on a scale of 100, with 100 being the highest, Dr. Jordan testified that Mother's global function was assessed at a level of 45. She also stated that while most adults with global functioning range of sixty (60) or higher could raise children, those with lower global scores would need assistance in order to raise a child. Dr. Jordan further testified that medication could help improve a person's global rating and admitted that Mother had not had a global functioning reassessment since being placed on her new medication. Dr. Jordan also testified that Mother had tested positive for cocaine in November 2004, but had tested negative for illegal substances since that time.

Throughout her early sessions with Mother, Dr. Jordan testified that Mother stated that she heard voices which told her to hurt people. Dr. Jordan stated that Mother reported hearing such voices two to three times per week until a medication change in January 2005. Dr. Jordan also testified that Mother had cancelled some of her appointments in the past and further indicated that she was uncertain whether Mother was taking her medication as prescribed. However, overall, Dr. Jordan stated that Mother was "reasonably good" in complying with her treatment.

On July 22, 2005, the juvenile court entered an order terminating Mother's parental rights. In doing so, the court made the following findings of fact:

1. The child, [M.A.W.] has been in foster care continuously since August 2, 2000.

2. This child was found to be dependent and neglected by the Juvenile Court of Shelby County and was placed in the custody of the Department of Children's Services; the Department made reasonable efforts to prevent removal or the child's situation prevented reasonable efforts from being made prior to removal.

3. Respondent has attempted to comply with the Department's permanency plans and sincerely wishes that the child would be returned to her care.

4. The Court finds that the child has been removed by the order of the Juvenile Court of Shelby County for a period of six (6) months; the conditions which led to her removal still persist; other conditions persist which will in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return; there is little likelihood that these conditions will be remedied at an early date so that the child can be returned in the near future; and the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

5. Against [Mother], the Court finds that the circumstances that initially led to the child's removal still persist today in that pursuant to T.C.A. section 36-1-113, and, more particularly 36-1-113(g)(8)(B)(i), [Mother] is unable to adequately provide for the daily care and supervision of the child because of mental disease or defect. [Mother] has been diagnosed with bi-polar disorder and has a history of criminal behavior and unstable housing. [Mother] testified to twenty-nine evictions from various placements, homes, and shelters within the past five years.

6. The Court finds that the best interests factors as defined in T.C.A. 36-1-113 have been met in that [Mother] has not made such an adjustment of circumstances to make it safe for the child to be with her.

7. The Court is convinced that it is in the best interest of the child and the public that all of the parental rights of Respondents to this child be forever terminated, and that the complete custody, control and guardianship of [M.A.W.] be awarded to the State of Tennessee, Department of Children's Services, with the right to place her for adoption and to consent to such adoption *in loco parentis.*

Mother appeals.

## Issues Presented

We perceive the issues on appeal to be as follows:

(1)     Whether DCS established by clear and convincing evidence one of the asserted grounds for the termination of Mother's parental rights to M.A.W., and

(2)     Whether clear and convincing evidence exists that termination of Mother's parental rights was in the best interests of M.A.W.

For the reasons set forth in this opinion below, we affirm.[3]

## Standard of Review

Our standard of review of a trial court sitting without a jury is *de novo* upon the record. *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of evidence is otherwise. Tenn. R. App. P. 13(d) (2006). However, no presumption of correctness attaches to a trial court's

---

[3]In her brief, Mother also raises the following two issues:

(1)     Whether the Trial Court erred in allowing the report of the Guardian Ad Litem to be considered in its ruling, and

(2)     Whether the Trial Court's finding of fact that the minor child was found to be "Dependent and Neglected" by the Juvenile Court of Memphis and Shelby County was in error.

At oral argument, Mother waived her issue concerning the alleged consideration report of the Guardian Ad Litem. In regard to Mother's argument concerning the "dependent and neglected" status of M.A.W., the record shows that a revised order was entered by the juvenile court stating, in pertinent part, as follows:

> the child is found to be dependent and neglected within the meaning of the law of the state of Tennessee in that said child was under such improper guardianship or control as to injure or endanger her health. That the mother of said child has been diagnosed with borderline personality disorder and schizophrenia effective disorder. And during her admission to Delta Medical Center's behavioral health unit, she was being monitored for suicidal tendencies and violent aggression. That prior to admission, she had no permanent residence of her own in which to raise and care for the child.
> Further, the circumstances create a threat of severe harm to said child and there is no less drastic alternative than removal that would protect said child from harm. Further, that the lack of reasonable efforts to prevent removal from the home is justified due to the mother's hospitalization for mental health issues, and due to the fact that there was no caretaker available to care for the child. Further, that foster care placement is in the child's best interest.

Counsel for DCS placed this order into evidence at trial and had a portion of it read into the record—all without objection from Mother's counsel. In light of these facts, we find Mother's second argument without merit.

conclusions on issues of law. *Bowden v. Ward,* 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d) (2006).

Tennessee Code Annotated § 36-1-113 governs the termination of parental rights. The code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c) (2005). This section also provides the grounds on which parental rights may be terminated. The existence of any statutory ground for termination of parental rights will support the trial court's decision to terminate those rights. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002).

A court's determination to terminate parental rights must be supported by clear and convincing evidence. *Id.* Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (quoting *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)). In describing what constitutes clear and convincing evidence, this Court has stated:

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App.1995); *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992); *O'Daniel v. Messier,* 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v.. Messier,* 905 S.W.2d at 188; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer,* 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts,* 622 S.W.2d 438, 441 (Tenn. Ct. App.1981); *Brandon v. Wright,* 838 S.W.2d at 536.

*In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *6 (Tenn. Ct. App. May 26, 1999)(*no perm. app. filed*)(quoting *Bingham v. Knipp*, No. 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn. Ct. App Feb. 23, 1999)(*no perm. app. filed*)).

*Analysis*

*Grounds for Termination*

Under section 36-1-113(g) of the Tennessee Code, a number of statutory grounds exist for the termination of a person's parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(1)–(9) (2005). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); *see also* Tenn. Code Ann. § 36-1-113(c) (2005). However, "[t]he trial court is required to find only one statutory ground for termination of parental rights." *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003).

In this case, the juvenile court found clear and convincing evidence that Mother's parental rights should be terminated on the following grounds: 1) Mother's inability to adequately provide for the further care and supervision of M.A.W. due to Mother's mental impairment, and 2) Mother's failure to remedy persistent conditions that prevent M.A.W.'s safe return. We will address each of these grounds in turn.

(1) *Mother's Mental Impairment*

The ground for mental impairment is set forth under section 36-1-113(g)(8)(B) and (C) of the Tennessee Code and provides that parental rights may be terminated under the following conditions:

> (8) . . . (B) The court may terminate the parental or guardianship rights of [the parent or guardian of a child] if it determines on the basis of clear and convincing evidence that:
>> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and
>> (ii) That termination of parental or guardian rights is in the best interest of the child.
>> (C) In the circumstances described under subdivisions (8)(A) and (8)(B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

Tenn. Code Ann. § 36-1-113(g)(8)(B) and (C) (2005).

In this case, M.A.W. was removed after mother was hospitalized in a mental care facility due to violent threats against herself and others resulting from mental illness. While it does

appear that Mother has taken steps to address her mental illness, the record clearly shows that Mother remains in such an impaired condition that it would be unsafe to return M.A.W. to Mother in the near future. Specifically, the record shows that Mother has been diagnosed with post traumatic stress syndrom, bipolar disorder, schizophrenia, borderline personality disorder, and seizures caused by frustration and anger. Dr. Jordan also testified in her deposition that, during her examination of Mother six months prior to trial, Mother had auditory hallucinations, mood instability, anxiousness, tearfulness, decreased appetite, decreased energy, increased anger, and decreased concentration–all of which were consistent with psychotic illness. Dr. Jordan further stated that Mother's auditory hallucinations were in the form of voices which told Mother to hurt people. While Dr. Jordan testified that Mother had reported not hearing the voices after a medication change in January 2005, Dr. Jordan could not state whether Mother took her medication as prescribed.

Uncontroverted evidence in the record shows that Mother had a history of non-compliance with her medication prior to M.A.W.'s removal. Furthermore, several parenting plans and progress reports drafted after M.A.W.'s removal indicated that Mother still had problems adhering to her medication schedule. Although Mother asserted that she had complied with her medication regimen since M.A.W.'s removal, Mother herself admitted at trial that, even when taking her medication, she still had difficulty interacting with others and had further engaged in acts of violence toward others. Mother also admitted engaging in acts of violence against her husband three months before trial. Furthermore, Ms. Teegarten, one of Mother's DCS caseworkers, testified that even if Mother remained compliant with her medication plan, Mother would still be unable to care for M.A.W.

Upon review of the entire record in this case, we find clear and convincing evidence supports the juvenile court's findings that, due to her mental conditions, Mother is incompetent to adequately provide for the further care and supervision of M.A.W. and will be unable to assume or resume the care and responsibility of M.A.W. in the near future.

(2) *Persistence of Conditions*

The ground of persistence of conditions is set forth under section 36-1-113(g)(3) and provides that parental rights may be terminated under the following conditions:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(i) The conditions which led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

-11-

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2005). "Under the clear language of the statute, the conditions which prevent the child's safe return to the home may be either (1) the conditions that led to removal or (2) other conditions likely to cause further neglect." *In re T.A.R.,* No. M2003-02801-COA-R3-PT, 2004 WL 2094534, at *4 (Tenn. Ct. App. Sept. 20, 2004) (*no perm. app. filed*); *see also In re S.Y..* 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003) (finding that, although the conditions that led to the children's removal had been remedied, other conditions warranted a finding that children would be subject to further neglect if returned to the parent).

In this case, M.A.W. was taken into state custody on August 7, 2000, due to Mother's mental illness as well as her inability to maintain stable housing or a stable environment for M.A.W. At the time of trial, M.A.W. had been in state custody for nearly five years. The record reflects that, during that time, Mother continued to struggle with mental health issues and further failed to maintain stability in either her living situation or personal life. In regard to Mother's mental health, the record clearly shows that Mother has suffered from auditory hallucinations mental instability, and has had continued difficulty controlling her anger. Mother also reported hearing voices telling her to hurt people as recently as January 21, 2005. Although the record indicates that medications have controlled Mother's hallucinations, Mother herself testified that, even when complying with her medication regimen, she still had difficulty interacting with others and further admitted engaging in acts of violence against her husband and others.

In regard to Mother's personal life, the record clearly shows that she continues to be involved in a relationship which has a history of domestic violence and in which verbal altercations occur several times on a weekly basis. The record also shows that Mother has been incarcerated twice for assault and domestic violence–once for cutting her husband on the wrist and once for hitting him in the face with a stick. The record further shows that mother physically assaulted her husband a mere three months before trial. In addition to her arrests related to violence, Mother has also been incarcerated for forgery. In addressing Mother's housing situation, the record clearly shows that Mother has been evicted not less than twenty-nine times since M.A.W.'s removal. When questioned about the reason for her numerous evictions, Mother testified that the evictions resulted from a series of verbal and physical altercations between Mother, her husband, and various guests. Beyond her numerous evictions, the record further reflects that Mother has difficulty in maintaining utility service and in keeping adequate food provisions in her home.

After reviewing the record in whole, it is clear to us that the persistence of Mother's continued mental illness and violent tendencies as well as the persistence of her inability to maintain stable housing or a stable home environment prevents the safe return of M.A.W. to the custody of Mother, and there is little likelihood that these conditions will be remedied at an early date. Further, we conclude that clear and convincing evidence supports the juvenile court's

findings that the continuation of the parent-child relationship in this case would greatly diminish M.A.W.'s chances of integrating into a safe, stable, and permanent home. The uncontroverted evidence at trial was that M.A.W. is a healthy, developing child who has bonded with her foster parents, who wish to adopt her. Therefore, we conclude that clear and convincing evidence support's the juvenile court's termination of Mother's parental rights based upon persistence of conditions.

*Best Interests of Child*

After grounds for termination have been established by clear and convincing evidence, the final step in the analysis is a finding by the court of whether termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2)(2005). In making this determination, the court is guided by a number of non-exhaustive factors set out in section 36-1-113(i) of the Tennessee Code:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2005).

Applying the foregoing statutory factors, the juvenile court found that termination of Mother's parental rights was in M.A.W.'s best interest due to 1) the persistence of conditions preventing M.A.W.'s safe return to Mother, and 2) Mother's inability to care for M.A.W. as a result of Mother's impaired mental condition. After a review of the record in this case, we find that the juvenile court's findings are supported by clear and convincing evidence. While the record shows that Mother took steps to address her mental conditions, it also shows that Mother's mental health status would be detrimental to M.A.W. and prevent Mother from effectively providing safe and stable care for M.A.W. As previously noted, Mother suffers from post traumatic stress syndrom, bipolar disorder, schizophrenia, borderline personality disorder, psychosis, and seizures caused by frustration and anger. Despite her assurances that she complies with her medication regimen, the record shows that she had difficulty complying with her medications before M.A.W.'s removal and had further problems with compliance afterward. Furthermore, Mother herself admitted at trial that, even when on her medications, she still has difficulty getting along with people and has reacted violently toward others.

In addition to Mother's mental status, the record also shows that Mother has failed to make a lasting adjustment to her living situation and that returning M.A.W. to such an environment would not be safe. Specifically, the record shows that in the five-year period since M.A.W.'s removal, Mother has been unable to maintain a stable residency and has been evicted not less than twenty-nine (29) times. The record also shows that Mother has had difficulty in maintaining utility service and in keeping food in her home. However, beyond Mother's housing situation, the record further shows that Mother and her husband have a history of domestic violence, and that Mother alone has engaged in numerous acts of physical violence since M.A.W's removal. In light of the foregoing, we find that the juvenile court's holding that termination of Mother's parental rights is in the best interest of M.A.W. is clearly and convincingly supported by the record. We affirm.

### *Conclusion*

The evidence in the record clearly and convincingly establishes one or more statutory grounds for termination. In addition, termination is in M.A.W.'s best interest, having been shown by clear and convincing evidence. Accordingly, we affirm the juvenile court's judgment terminating the parental rights of Mother, T.H.W. Costs of this appeal are taxed against appellant, T.H.W., and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-14-